513 S.E.2d 657

Stephen A. WICKLAND, Administrator with the Will Annexed of Hazel Mowrey Hardman, Deceased, Plaintiff Below, Appellant,

v.

AMERICAN TRAVELLERS LIFE IN-SURANCE COMPANY, an Insurance Company, and Joseph A. McClain, De-fendants Below, Appellees.

No. 25167.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 7, 1998.

Decided Nov. 4, 1998.

Stephen A. Wickland, Clarksburg, West Virginia, Attorney for the Appellant.

Robert G. Steele, Jacqueline A. Wilson, Steptoe & Johnson, Clarksburg, West Virginia, Attorneys for the Appellees.

DAVIS, Chief Justice:

Stephen A. Wickland, Administrator with the will annexed of Hazel Mowrey Hardman, plaintiff below and appellant herein [hereinafter Administrator Wickland], appeals the July 22, 1997, order of the Circuit Court of Lewis County denying Administrator Wickland's motion for summary judgment and granting the cross-motion for summary judgment of defendants below and appellees herein, American Travellers Life Insurance Company and Joseph A. McClain. In rendering its decision, the circuit court concluded that the medical condition necessitating Ms. Hardman's admission into a nursing home was a preexisting condition and that the policy language of her long-term care insurance [1] expressly excluded from coverage

---

1. "Long-term care insurance" signifies any insurance policy or rider advertised, mar- keted, offered or designed to provide benefits for not less than twenty-four consecutive

the resultant care. Upon a review of the parties' arguments on appeal, the record evidence, and the pertinent authorities, we conclude that an insured's periodic complaints of symptoms, without medical advice or treatment therefor, do not constitute a preexisting medical condition, as that term is defined by W. Va.Code § 33–15A–6(c)(1) (1989) (Repl. Vol.1996). Furthermore, while we recognize that such symptoms may, when considered in conjunction with other factors, be indicative of a preexisting condition, we find that these additional factors did not accompany Ms. Hardman's symptoms. Accordingly, we reverse the decision of the Circuit Court of Lewis County. We additionally remand this case for the entry of summary judgment in favor of Administrator Wickland.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The basic facts of this controversy generally are not disputed by the parties. On October 25, 1993, Hazel Mowrey Hardman [hereinafter Ms. Hardman or the decedent] [2] met with Joseph A. McClain, defendant below and appellee herein [hereinafter Mr. McClain], an agent of the co-defendant below and co-appellee herein, American Travellers Life Insurance Company [hereinafter American Travellers], for the purpose of purchasing a long-term care insurance policy. During this meeting, attended only by Ms. Hardman and Mr. McClain, Ms. Hardman disclosed that she "[wa]s currently being treated or ha[d] been treated in the last

months for each covered person on an expense incurred, indemnity, prepaid or other basis; for one or more necessary or medically necessary diagnostic, preventive, therapeutic, rehabilitative, maintenance or personal care services, provided in a setting other than an acute care unit of a hospital....
W. Va.Code § 33–15A–4(a) (1989) (Repl.Vol. 1996).

2. The parties represent that, on October 25, 1993, Ms. Hardman was eighty-one years old and lived with her daughter.

3. Although Ms. Hardman had authorized the release of her medical records to American Travellers for the purpose of processing her insurance

five years" for diabetes and cornea transplant. She further listed on the application that she was then taking medications for bladder control, blood pressure, fluid control, and eye problems. At the end of the insurance application, Ms. Hardman signed a statement "authoriz[ing] any insurance company, hospital, nursing home or other medical facility, physician or other medical practitioner having any information or knowledge of me or my health to give such information to American Travellers Life Insurance Company in order to process this application." [3] Also evidenced by the insurance application is the fact that Mr. McClain received from Ms. Hardman a twelve-month premium in the amount of $2,449.00, and noted the effective date of the policy as October 25, 1993.

Thereafter, in March and April, 1994, Ms. Hardman experienced several episodes of vertigo accompanied by falls, for which she received medical treatment and was hospitalized. Dr. Angotti treated Ms. Hardman for, and diagnosed her as having, vertigo on March 14, 1984, and April 4, 1994. As a result of her numerous falls and the other symptoms of her vertigo, Ms. Hardman was admitted to Holbrook Nursing Home on April 20, 1994, [4] approximately five months and twenty-six days after the effective date of her long-term care insurance coverage. Upon filing a claim for benefits under her American Travellers long-term care insurance policy, Ms. Hardman was informed that her convalescence would not be covered because her nursing home admission resulted

application, the record on appeal indicates that her treating physician, Dr. J.D. Angotti, M.D., did not send her medical records to American Travellers until July 18, 1994, after Ms. Hardman had been admitted to Holbrook Nursing Home and had filed a claim for benefits. Contrariwise, American Travellers states that it obtained Ms. Hardman's medical records in the course of approving her application for long-term care insurance coverage.

4. Ms. Hardman remained in Holbrook Nursing Home, in West Virginia, from April 20, 1994, until September, 1996, when she was transferred to Friends Care Nursing Center, in Ohio, where she remained until her death on February 26, 1997.

from a preexisting condition.[5] In its declination of coverage letter, American Travellers rejected Ms. Hardman's claim for benefits stating specifically that

[t]he medical condition for which you received treatment pre-exists the policy. Pre-existing conditions are illnesses or injuries for which you sought medical treatment or advice prior to your policy's effective date. Your policy does not provide benefits for this condition unless your loss begins more than six (6) months after your policy's effective date. . . .

In response to this denial of benefits, Ms. Hardman, by her attorney-in-fact,[6] filed a civil action in the Circuit Court of Lewis County, on September 5, 1995, against American Travellers and Mr. McClain [hereinafter collectively referred to as American Travellers] seeking coverage of her nursing home expenses under her long-term care policy.[7] During a January 12, 1996, hearing, counsel for American Travellers informed the circuit court that Ms. Hardman's preexisting condition, upon which her claim had been rejected, was vertigo and falls.[8] In this regard, American Travellers indicated that Ms. Hardman's medical records evidenced treatment for vertigo and dizziness within the six months preceding her insurance application.

The medical records from Ms. Hardman's treating physician showed that during the six-month period preceding the effective date of her long-term care insurance policy, *i.e.,*

from April 25, 1993, until October 25, 1993, Ms. Hardman twice complained of occasional dizziness. These medical records for the relevant six-month period did not, however, contain any references to falls or vertigo, or otherwise indicate that Ms. Hardman experienced falls or vertigo during this time frame.

On March 20, 1997, Administrator Wickland, on behalf of the decedent's estate, moved for summary judgment. Defendants American Travellers and Mr. McClain opposed the estate's motion and cross-moved for summary judgment. By order dated July 22, 1997, the Circuit Court of Lewis County ruled:

it appears to the Court that the policy of insurance in question expressly provides, "No loss due to a Pre–Existing Condition will be covered unless the Period of Care begins at least six months after the Effective Date of coverage. The Policy is not considered to be in force or effective with respect to coverage for the pre-existing conditions until six months after the Effective Date shown in the Policy Schedule."

The policy contains the following definition: " 'Pre-existing Condition' means a condition for which medical advice or treatment was recommended by or received from a physician within six months preceding the Effective Date of coverage." The parties have agreed that Hazel M. Hardman went to a nursing home before six

---

5. On the face of the "Long Term Care Insurance Policy," issued by American Travellers to Ms. Hardman, appeared a **"PRE–EXISTING CONDITION LIMITATION,"** stating "[n]o loss due to a Pre–Existing Condition will be covered unless the Period of Care begins at least six months after the Effective Date of coverage. The Policy is not considered to be in force or effective with respect to coverage for the pre-existing conditions until six months after the Effective Date shown in the Policy Schedule." The policy further defines a "preexisting condition" as "a condition for which medical advice or treatment was recommended by or received from a physician, within six months preceding the Effective Date of coverage."

6. In conjunction with its summary judgment ruling, discussed below, the circuit court permitted Administrator Wickland, on behalf of the decedent's estate, to be substituted as a party for the decedent, who had been represented before her death by her attorney-in-fact.

7. The policy provides long-term care benefits of $80.00 per day, for a maximum period of two years, for covered admissions to facilities providing nursing care twenty-four hours per day. The "elimination period," or "the period of time . . . which must pass before benefits will be payable under this policy," was "000 days".

8. The parties suggest that, during the course of discovery in the circuit court, American Travellers disclosed Ms. Hardman's preexisting conditions to also include: accelerated hypertension, valvular heart disease, coronary artery disease, hyperlipidemia, chronic renal insufficiency, urinary incontinence, peptic ulcer disease, diverticulosis, non-insulin dependent (NIDDM) diabetes mellitus with neuropathy, chronic fatigue, chronic sinus trouble, occasional orthostatic dizziness, imbalance, and possible rheumatoid arthritis.

months had elapsed from the effective date of the policy. Plaintiff, by counsel, represents to the Court that Hazel M. Hardman was admitted to the nursing home for a condition described as "falls and vertigo". Based upon the matters in the Court file, the Court finds that Hazel M. Hardman had exhibited the symptoms and the conditions of vertigo within the period of time which was set forth in the policy with respect to pre-existing conditions and as such, the period of nursing home care would not be covered or would be excluded under the policy in question. For the reasons hereinbefore stated and based upon the matters presented to the Court and in the Court file, the Court hereby finds that the defendants are entitled to summary judgment and the Court hereby enters summary judgment in favor of the defendants, American Travellers Life Insurance Company and Joseph A. McClain in this civil action.

Administrator Wickland subsequently moved that the judgment be altered or amended. On September 16, 1997, the circuit court similarly denied this motion. From these adverse rulings, Administrator Wickland, for the decedent's estate, appeals to this Court.

## II.

## DISCUSSION

The primary issue presented by the parties for resolution by this Court is whether Ms. Hardman had preexisting conditions of falls and vertigo such that her nursing home care and expenses necessitated by her episodes of falls and vertigo were excluded from coverage under her long-term care policy.[9] Following a brief discussion of the applicable

standard of review, we will address the arguments of the parties.

### A. Standard of Review

■ Procedurally, this case is before this Court on appeal from the circuit court's denial of Administrator Wickland's motion to alter or amend the summary judgment granted in favor of American Travellers by order entered July 22, 1997. Rule 59(e) of the West Virginia Rules of Civil Procedure permits a party to make "[a] motion to alter or amend the judgment ... [within] 10 days after entry of the judgment." The practical effect of such a motion is to enlarge the time within which an appeal must be filed as to those matters which are the subject of the motion. *See, e.g.,* Syl. pt. 7, *James M.B. v. Carolyn M.,* 193 W.Va. 289, 456 S.E.2d 16 (1995) ("A motion for reconsideration filed [pursuant to W. Va. R. Civ. P. 59(e) ] within ten days of judgment being entered suspends the finality of the judgment and makes the judgment unripe for appeal. When the time for appeal is so extended, its full length begins to run from the date of entry of the order disposing of the motion."); *Lieving v. Hadley,* 188 W.Va. 197, 200–01 n. 3, 423 S.E.2d 600, 603–04 n. 3 (1992) (" 'The full time for filing a petition for appeal commences to run and is to be computed from the entry of any of the following orders made upon a timely motion under such rules: ... granting or denying a motion under Rule 59 to alter or amend the judgment ....' " (quoting W. Va. R. Civ. P. 72) (emphasis omitted)). *Cf.* W. Va. R.App. P. 3(a) ("No petition shall be presented for an appeal from ... any judgment, decree or order, which shall have been rendered more than four months before such petition is filed in the office of the clerk of the circuit court where the judgment, decree or order being appealed was entered

---

9. In the presentation of his appeal to this Court, Administrator Wickland raises two additional issues: (1) whether the circuit court erroneously denied policy benefits to Ms. Hardman's estate after the expiration of the six-month waiting period applicable to coverage of preexisting conditions and (2) whether the circuit court properly excluded from coverage a preexisting medical condition that had not been discussed with Ms. Hardman prior to the issuance of her long-term care insurance policy. However, our resolution of this case pursuant to the first issue raised by

Administrator Wickland, *i.e.,* whether Ms. Hardman had preexisting conditions of falls and vertigo such as to preclude coverage for her nursing home care resulting from these episodes, renders it unnecessary to our disposition of the instant appeal to consider the two additional errors assigned by Administrator Wickland. *See, e.g., Campbell v. Kelly,* 157 W.Va. 453, 477, 202 S.E.2d 369, 383 (1974) ("declin[ing] to pass upon ... question as it [wa]s not necessary to the resolution of the other issues of th[e] case").

.....")". In other words, only those errors raised in the motion to alter or amend judgment benefit from an extended appeal period; those issues not assigned as grounds supporting an alteration or amendment of the judgment retain the original filing period applicable to appeals in general.

While such motions are readily available to parties, appeals to this Court are more frequently premised upon the errors attending the underlying judgment as opposed to the propriety of a denial of a Rule 59(e) motion. *See, e.g., Kessel v. Leavitt*, 204 W.Va. 95, 186, 511 S.E.2d 720, 811 (1998) (noting that defendants filed Rule 59(e) motion, but deciding whether compensatory damages awarded by jury were excessive); *Blais v. Allied Exterminating Co.*, 198 W.Va. 674, 675 n. 3, 482 S.E.2d 659, 660 n. 3 (1996) (limiting appeal of order denying Rule 59(e) motion to issue of whether equitable estoppel precluded appellee from asserting statute of limitations defense); *State ex rel. Forbes v. Caperton*, 198 W.Va. 474, 477–78, 481 S.E.2d 780, 783–84 (1996) (determining, in appeals from denials of Rule 59(e) motions, primary issue to be matter of constitutional construction). Thus, when this Court has been asked to decide an appeal arising from the denial of a motion to alter or amend a judgment, we typically have looked beyond the motion to the nature of the underlying judgment from which the motion has been made, and from which the appeal ultimately is taken, to find the appropriate standard of review. *See, e.g., McDaniel v. Kleiss*, 202 W.Va. 272, 276, 503 S.E.2d 840, 844 (1998) (utilizing standard of review applicable to questions of law to resolve propriety of court's distribution of funds challenged by Rule 59(e) motion); *Carte v. Cline*, 200 W.Va. 162, 165, 488 S.E.2d 437, 440 (1997) (examining order, resulting from denial of Rule 59(e) motion, pursuant to standard of review for appeals of administrative decisions); *Richardson v. Kennedy*, 197 W.Va. 326, 331, 475 S.E.2d 418, 423 (1996) (employing standard of review for dismissal of complaint where Rule 59(e) motion sought to alter or amend circuit court's decision to dismiss complaint).

■ Adhering to our practice of referring to the nature of the judgment underlying a Rule 59(e) motion, we therefore hold that the standard of review applicable to an appeal from a motion to alter or amend a judgment, made pursuant to W. Va. R. Civ. P. 59(e), is the same standard that would apply to the underlying judgment upon which the motion is based and from which the appeal to this Court is filed. For example, if a motion is made to alter or amend a declaratory judgment, the standard of review would be *de novo* since we review *de novo* a declaratory judgment order. *See* Syl. pt. 3, *Cox v. Amick*, 195 W.Va. 608, 466 S.E.2d 459 (1995). Likewise, if the underlying judgment upon which a motion to alter or amend is based is the grant, by the circuit court, of the extraordinary writ of mandamus, we would employ a *de novo* standard of review as is our ordinary practice when a circuit court has granted such extraordinary relief. *See* Syl. pt. 1, *Hensley v. West Virginia Dep't of Health & Human Resources*, 203 W.Va. 456, 508 S.E.2d 616 (1998).

■ With respect to the case *sub judice*, the judgment which underlies Administrator Wickland's Rule 59(e) motion is summary in nature. Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." W. Va. R. Civ. P. 56(c). *See also* Syl. pt. 1, in part, *Tolliver v. Kroger Co.*, 201 W.Va. 509, 498 S.E.2d 702 (1997) ("A motion for summary judgment should be granted only when it is clear that [sic] no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." (internal quotations and citations omitted)). For purposes of summary judgment, a "genuine issue"

> "is simply one half of a trialworthy issue, and a genuine issue does not arise unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict for that party. The opposing half of a trialworthy issue is present where the non-moving party can point to one or more disputed 'material' facts. A material fact is one that has the capacity to sway the outcome of the litigation under the applicable law." Syllabus point 5, *Jivi-*

den v. Law, 194 W.Va. 705, 461 S.E.2d 451 (1995).

Syl. pt. 3, *Greenfield v. Schmidt Baking Co., Inc.*, 199 W.Va. 447, 485 S.E.2d 391 (1997). Once a circuit court is satisfied that summary judgment is proper and has granted such relief, " '[its] entry of summary judgment is reviewed de novo.' Syl. Pt. 1, [in part,] *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994)." Syl. pt. 1, in part, *McGraw v. St. Joseph's Hosp.*, 200 W.Va. 114, 488 S.E.2d 389 (1997). Having established the proper standard of review, we now turn to the parties' contentions.

### B. Definition of Preexisting Condition

Administrator Wickland assigns as error the circuit court's finding that the decedent's falls and vertigo, which precipitated her nursing home admission, constituted a preexisting condition for which benefits were not recoverable under her long-term care insurance policy. In his argument, Administrator Wickland concedes that Ms. Hardman was treated for various conditions, including occasional orthostatic dizziness and imbalance, within the six-month period preceding the effective date of her long-term care coverage, *i.e.*, October 25, 1993. However, he disputes the interpretation given these ailments by both American Travellers and the circuit court, that is, that because the decedent appeared to have had symptoms of falls and vertigo, she presumably received medical advice or treatment for this condition. Rather, Administrator Wickland urges that a medical condition cannot be a preexisting condition until the patient actually receives specific medical advice or treatment therefor. Accordingly, because Dr. Angotti did not render a diagnosis of falls and vertigo, or treat Ms. Hardman for this illness, until March 14, 1994, approximately four and one-half months *after* the effective date of Ms. Hardman's long-term care coverage, falls and vertigo did not constitute a preexisting condition as defined by either the policy or the applicable statutory language of W. Va.Code § 33–15A–6(c)(1) (1989) (Repl.Vol.1996).

American Travellers responds that the circuit court did not err in concluding that Ms. Hardman's falls and vertigo constituted a preexisting condition such as to preclude coverage under her long-term care policy. The medical records provided by Dr. Angotti demonstrate that Ms. Hardman presented symptoms of vertigo, dizziness, and imbalance at various times from January, 1993, until March, 1994, and received treatment for these conditions on July 13, 1993, and August 30, 1993, within the six months preceding the effective date of coverage. Thus, American Travellers suggests that because the existence of symptoms may properly be equated with the presence of the illness itself, the circuit court's finding that the decedent "had exhibited *the symptoms and the conditions* of vertigo" is not inconsistent with the conclusion that she had a preexisting condition of falls and vertigo, as defined by W. Va. Code § 33–15A–6(c)(1) and her policy of long-term care insurance. (Emphasis added).

Prior to ascertaining the precise meaning of the insurance policy's preexisting condition clause at issue in this appeal, and construing it consistently with the governing statutory provision, it is necessary to first revisit some general principles applicable to the interpretation of policies of insurance. When interpreting challenged language in an insurance policy, it has been the widely held practice of this Court to give effect to the meaning of the disputed terms intended by the parties to the contract to the extent possible. "An insurance policy should never be interpreted so as to create an absurd result, but instead should receive a reasonable interpretation, consistent with the intent of the parties." Syl. pt. 2, *D'Annunzio v. Security–Connecticut Life Ins. Co.*, 186 W.Va. 39, 410 S.E.2d 275 (1991). Thus, "[w]here the provisions of an insurance policy contract are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended." Syl., *Keffer v. Prudential Ins. Co. of Am.*, 153 W.Va. 813, 172 S.E.2d 714 (1970). To this end, "[l]anguage in an insurance policy should be given its plain, ordinary meaning." Syl. pt. 1, *Soliva v. Shand, Morahan & Co., Inc.*, 176 W.Va. 430, 345 S.E.2d 33 (1986).

■ The controverted policy language involved in the instant appeal concerns the definition of a "preexisting condition." In its long-term care policy, American Travellers has defined a "preexisting condition" as "a condition for which medical advice or treatment was recommended by or received from a physician, within six months preceding the Effective Date of coverage." The language of the governing statute regulating long-term care insurance and similarly defining "preexisting condition" is virtually identical to the language employed by American Travellers:

> [n]o long-term care insurance policy ... shall use a definition of "preexisting condition" which is more restrictive than the following: *Preexisting condition means a condition for which medical advice or treatment was recommended by, or received from a provider of health care services, within six months preceding the effective date of coverage of an insured person.*

W. Va.Code § 33–15A–6(c)(1) (1989) (Repl. Vol.1996) (emphasis added).[10] Looking to the various terms employed in these definitions, it appears that the words most apt to differing interpretations are "condition," "advice," and "treatment." These various interpretations are evidenced by the conflicting constructions of these provisions relied upon by Administrator Wickland and American Travellers.

■ First, and perhaps most contested, is the term "condition." Administrator Wickland urges this Court to find that an insured does not have a "condition," such as

would form the basis for a finding of a preexisting condition, unless he/she has received specific medical advice or treatment, by a physician or health care provider, for that particular ailment, illness, or disease. Contrariwise, American Travellers adopts the view of the circuit court that the presence of symptoms may be sufficient to constitute a "condition" for purposes of finding the presence of a preexisting condition.[11] Looking to the plain and generally accepted meaning of the term "condition," however, we are able to obtain a better understanding of the usage of this term in the present context. The term "condition" has been defined variously as a "[m]ode or state of being"[12]; "an abnormal or diseased state of part of the body"[13]; "a state of being, specifically in reference to physical and mental health or well-being"[14]; "[a] particular mode of being of a person ...; state of being"[15]; and "a usu[ally] defective state of health"[16]. These definitions all indicate that "condition" refers generally to an individual's physical state of health and particularly to any ailments, abnormalities, or infirmities associated therewith.

However, our inquiry as to the meaning and application of the "preexisting condition" clause at issue does not end here. Rather, when viewing the remaining components of the preexisting condition definition, we find that it is not enough for an insured to simply have a "condition" as a prerequisite to finding that he/she has a "preexisting condition." Instead, not only must the insured individual have a "condition," but he/she must also have received medical "advice or treatment" from

10. Due to the similarity of terminology employed by both American Travellers and the West Virginia Legislature in their definitions of a "preexisting condition," our subsequent references to and interpretations of the "preexisting condition" clause will refer interchangeably both to the policy and statutory language, except where otherwise noted.

11. Although we have recognized that the parties to this appeal have advanced conflicting interpretations of the long-term care policy language at issue herein, such disagreement does not automatically render the policy language ambiguous so as to preclude our resort to the plain, ordinary meaning of the constituent terms. *See* Syl. pt. 1, *Berkeley County Pub. Serv. Dist. v. Vitro Corp. of Am.,* 152 W.Va. 252, 162 S.E.2d 189 (1968)

("The mere fact that parties do not agree to the construction of a contract does not render it ambiguous. The question as to whether a contract is ambiguous is a question of law to be determined by the court.").

12. Black's Law Dictionary 293 (6th ed.1990).

13. Random House Dictionary of the English Language 425 (2d ed., unabridged, 1987).

14. Mosby's Medical and Nursing Dictionary 273 (2d ed.1986).

15. II Oxford English Dictionary 786 (1970).

16. Webster's Ninth New Collegiate Dictionary 274 (1983).

438

a physician or other health care provider pertaining to such condition. Alternatively, an insured may satisfy the "condition" criteria if he/she has a condition and has received a recommendation of medical "advice or treatment" therefor from a physician or other health care provider.

In ordinary parlance, the word "advice" is understood to mean a "[v]iew; opinion; [or] information" [17]; "an opinion or recommendation offered as a guide to action . . . ." [18]; an "[o]pinion given or offered as to action . . . spec[ifically] medical . . . counsel" [19]; and a "recommendation regarding a decision or course of conduct" [20].

Similarly, the commonly accepted meaning of the term "treatment" signifies "all the steps taken to effect a cure of an injury or disease; including examination and diagnosis as well as application of remedies" [21]; "[t]he medical or surgical management of a patient" [22]; "the management and care of a patient for the purpose of combating disease or disorder" [23]; "management in the application of medicines, surgery, etc." [24]; "the care and management of a patient to combat, ameliorate, or prevent a disease, dis[or]der, or injury" [25]; "[a]ny measure taken to prevent or cure a disease or disorder or to relieve symptoms" [26]; "[m]anagement in the application of remedies; medical or surgical application or service" [27]; and "the act or manner or an instance of [caring for] someone [medically or surgically]" [28].

Having reviewed the plain, ordinary meaning of the terms utilized in the definition of "preexisting condition," we are unable to accept as correct the construction of the preexisting condition clause espoused by American Travellers and approved by the circuit court wherein the mere presence of symptoms is sufficient to indicate the existence of a preexisting condition. This view is simply inequitably broad.

First and foremost, a complaint of a "symptom" is not equivalent to the presence of the "condition" causing such symptom. The term "symptom" has been variously defined as "[a]ny morbid phenomenon or departure from the normal in function, appearance, or sensation, experienced by the patient and indicative of disease" [29]; "any subjective evidence of disease or of a patient's condition, i.e., such evidence as perceived by the patient; a change in a patient's condition indicative of some bodily or mental state" [30]; "a phenomenon that arises from and accompanies a particular disease or disorder and serves as an indication of it" [31]; "a subjective indication of a disease or a change in condition as perceived by the patient" [32]; "[a]n indication of a disease or disorder (such as pain) that is noticed by the sufferer" [33]; "[a] (bodily or mental) phenomenon, circumstance, or change of condition arising from and accompanying a disease or affection, and constituting an indication or evidence of it[;] a characteristic sign *of* some particular disease" [34]; and "subjective evidence of disease

17. Black's, *supra* note 12, at 54.

18. Random House, *supra* note 13, at 29.

19. I Oxford English Dictionary 139 (1970).

20. Webster's, *supra* note 16, at 59.

21. Black's, *supra* note 12, at 1502.

22. Stedman's Medical Dictionary 1477 (5th unabridged lawyers' ed.1982).

23. Sloane–Dorland Annotated Medical–Legal Dictionary 746 (1987).

24. Random House, *supra* note 13, at 2015.

25. Mosby's, *supra* note 14, at 1145.

26. American Medical Association Encyclopedia of Medicine 1008 (1989).

27. XI Oxford English Dictionary 309 (1970).

28. Webster's, *supra* note 16, at 1257 (definition of "treatment" with excerpts of definition of "treat" inserted, where relevant).

29. Stedman's, *supra* note 22, at 1379.

30. Sloane–Dorland, *supra* note 23, at 685.

31. Random House, *supra* note 13, at 1927.

32. Mosby's, *supra* note 14, at 1095.

33. American Medical Association, *supra* note 26, at 959.

34. X Oxford English Dictionary 372 (1970).

or physical disturbance; ... something that indicates the presence of bodily disorder" [35]. Thus, while, as discussed above, a "condition" generally refers to any specific defect in one's overall state of health, a "symptom" merely provides a subjective indication that a particular condition may be present. Because symptoms are subjective, however, the presence of a symptom cannot be equated with the existence of a condition. Rather, before a condition may be said to have arisen from a symptom, a medical professional must first conduct further assessment of the symptom complained of and conclude that such condition, as evidenced by the symptom, does in fact exist.

Moreover, the interpretation of a preexisting condition advanced by American Travellers and adopted by the circuit court is not supported by the governing statutory authority. In regulating long-term care insurance in this State, the West Virginia Legislature intended

> to promote the public interest, *to promote the availability of long-term care insurance policies, to protect applicants for long-term care insurance, as defined, from unfair or deceptive sales or enrollment practices,* to establish standards for long-term care insurance, to facilitate public understanding and comparison of long-term care insurance policies, *and to facilitate flexibility and innovation in the development of long-term care insurance coverage.*

W. Va.Code § 33–15A–2 (1989) (Repl.Vol. 1996) (emphasis added). To achieve these goals, the Legislature additionally undertook to define various terms and phrases that might conceivably be utilized in a long-term care insurance policy. *See* W. Va.Code §§ 33–15A–4 (1989) (Repl.Vol.1996) ("[d]efinitions") and 33–15A–6 ("[d]isclosure and performance standards"). One of these passages defines a "preexisting condition," and prohibits any definition more restrictive than the following: "[p]reexisting condition means a condition for which medical advice or treatment was recommended by, or received from a provider of health care services, within six

months preceding the effective date of coverage of an insured person." W.Va.Code § 33–15A–6(c)(1).

Unlike the law-making bodies of other jurisdictions, the Legislature of this State did not include within the scope of "preexisting condition" symptoms, the presence of which would indicate, or be suggestive of, a "preexisting condition." *See, e.g.,* Alaska Stat. § 21.53.030(a) (1990) (Michie Main Vol.1996) ("[P]reexisting condition means the existence of symptoms that would cause an ordinarily prudent person to seek diagnosis, care, or treatment, or a condition for which medical advice or treatment was recommended by, or received from a provider of health care services, within six months preceding the effective date of coverage of an insured person."); Fla. Stat. Ann. § 627.9407(4)(a) (1992) (West Main Vol.1996) (same); Ga.Code Ann. § 33–42–6(c)(1) (1989) (1996 ed.) (same); 215 Ill. Comp. Stat. Ann. § 5/351A–5(a) (1989) (West Main Vol.1993) (same); Iowa Code Ann. § 514G.7(3)(a) (1995) (West Main Vol.1998) (same); Or.Rev.Stat. § 743.655(3)(a) (1991) (Main Vol.1997) (same); Va.Code Ann. § 38.2–5204(A) (1990) (Michie Repl.Vol.1994) (same). Had the West Virginia Legislature desired such an expansive interpretation of a condition underlying a preexisting condition, it could have enlarged the scope of the preexisting condition clause, but this it did not do. Because the Legislature has narrowly delineated the criteria for a preexisting condition, this Court, too, is limited in the scope of permissible interpretation by the plain and ordinary meaning of these terms.

■ Having rejected the interpretation of "preexisting condition" suggested by American Travellers, we must, therefore, determine whether Administrator Wickland's arguments defining a preexisting condition are correct. Given the limited factual context of the case before us, though, we believe the more appropriate inquiry in this particular instance necessitates resolution of what a preexisting condition is not. Based upon our examination of the plain and ordinary mean-

---

**35.** Webster's, *supra* note 16, at 1196.

ing of the terms used to describe a preexisting condition, we hold that mere periodic complaints of symptoms by an insured, without a health care provider having rendered or recommended medical advice or treatment for the condition causing such symptoms, do not constitute a preexisting condition as that term is defined in W. Va.Code § 33–15A–6(c)(1) (1989) (Repl.Vol.1996), without an examination designed to elicit the condition causing the insured's symptoms; a definition by way of diagnosis of the condition causing such symptoms; or the application of medicinal or other therapies to prevent, cure, or relieve the condition causing the symptoms.

■ Applying this holding to the facts of the case *sub judice,* we conclude that Ms. Hardman did not have a preexisting condition of falls and vertigo, as defined by her long-term care insurance policy and the pertinent statutory language, such as would preclude the recovery of benefits for her resultant long-term care. According to both the policy and statutory language, the time frame within which a condition may be classified as a preexisting condition is "six months preceding the effective date of coverage." W. Va.Code § 33–15A–6(c)(1). Thus, the medical records covering the decedent's care from April 25, 1993, until October 25, 1993, the effective date of her long-term care policy, are relevant to ascertaining whether she had a preexisting condition of falls and vertigo.

During this six-month period, Ms. Hardman twice complained of occasional or episodic dizziness. On July 13, 1993, Dr. Angotti's notes reflect Ms. Hardman's "complain[t] of occasional ortostatic [sic] dizziness." During her next physical examination, on August 30, 1993, Ms. Hardman again indicated that she had experienced "episodic dizziness and imbalance but [she] denie[d] vertigo and state[d] that this is much better since [the] last evaluation."[36] The remainder of the medical records for this period do not mention dizziness, and there is no reference in any of the pertinent medical records to falls or vertigo.

Furthermore, apart from the recordation of these sporadic complaints of dizziness, the medical records of Dr. Angotti do not indicate that he rendered medical advice or treatment to Ms. Hardman for dizziness. The examination notes do not suggest any testing or investigation of the dizziness complaints, and there is no indication that Dr. Angotti recommended any type of further action respecting this ailment. Furthermore, the medical records contain no diagnosis of dizziness, and none of the medications prescribed for Ms. Hardman during this six-month period had as their specific purpose the cure, prevention, or relief of dizziness.

In short, it is apparent from the medical records that Ms. Hardman's physician did not consider her occasional complaints of dizziness as warranting any further investigation or as requiring any type of medical relief. As Ms. Hardman received no medical advice or treatment for dizziness during the six months preceding the effective date of

---

**36.** We make specific distinctions between the states of "dizziness" and "vertigo" given the references in medical authorities which distinguish them as separate diagnoses. *Compare* American Medical Association, *supra* note 26, at 367 (defining "dizziness" as "[a] sensation of unsteadiness and light-headedness"); Sloane–Dorland, *supra* note 23, at 223 (classifying "dizziness" as "a disturbed sense of relationship to space; a sensation of unsteadiness with a feeling of movement within the head; [and] light-head[ed]ness"); *and* Stedman's, *supra* note 22, at 419 (recognizing "dizziness" as "[a]n imprecise term commonly used by patients in an attempt to describe various peculiar subjective symptoms such as faintness, giddiness, light-headedness, or unsteadiness") *with* American Medical Association, *supra,* at 1047 (explaining "vertigo" as "[a]n illusion that one's surroundings or self are spinning, either horizontally or vertically" and noting that "[t]he term ['vertigo'] is sometimes used erroneously to describe *dizziness* "); Sloane–Dorland, *supra,* at 774 (indicating that "vertigo" is "an illusion of movement [or] a sensation as if the external world were revolving around the patient ... or as if he himself were revolving in space"; also stating that "[t]he term ['vertigo'] is sometimes erroneously used to mean any form of *dizziness* " (emphasis added)); *and* Stedman's, *supra,* at 1553 (terming "vertigo" as "[a] sensation of irregular or whirling motion, either of oneself ... or of external objects").

her long-term care coverage, and as Dr. Angotti recommended no such advice or treatment for these ailments, we conclude that Ms. Hardman did not have a preexisting condition of dizziness. Moreover, given the complete lack of reference to falls or vertigo in the applicable medical records, demonstrating that Ms. Hardman did not receive medical advice or treatment for these precise ailments during the period antedating her long-term care coverage, we find that she also did not have a preexisting condition of falls or vertigo. Accordingly, we reverse the contrary decision of the circuit court. Furthermore, because there exist no genuine issues of material fact and because Administrator Wickland is entitled, by our decision today, to a judgment as a matter of law, we remand this case to the circuit court for the entry of summary judgment in favor of Administrator Wickland.

Finally, we wish to emphasize the overriding public policy necessitating the result we today have obtained. Oftentimes, individuals purchase insurance to protect themselves from the financial burdens attending potential, but uncertain, risks. Among the available types of indemnity is the long-term care insurance policy. The intent of this type of insurance is to guarantee monetary resources for the payment of admissions to care facilities necessitated by injury, illness, or infirmity. Frequently, those securing such insurance will be older individuals who, due to the inevitably fallible design of the human body, may likely suffer many isolated symptoms indicative of various illnesses, diseases, ailments, disorders, or injuries, but who have not sought or required medical advice or treatment for any specific condition.

Were we to have adopted the interpretation of the "preexisting condition" clause urged by American Travellers in this appeal, we would have effectively denigrated the consideration paid by these individuals for their long-term care insurance coverage, as the mere presence of symptoms would have sufficed to indicate the existence of a preexisting condition, upon which the rejection of claims for benefits could have been premised. Moreover, such an interpretation would most certainly have resulted in a general decline in the health and well-being of our citizenry. For fear that any reported complaints could, at some later date, be construed as being indicative of a preexisting condition which would preclude the recovery of long-term care benefits, many insureds would have chosen, instead, to keep all of their complaints to themselves to prevent such a denial of coverage. This lack of disclosure most assuredly would have produced the camouflaging of the early signs of illnesses and diseases that otherwise might have been curable, preventable, or treatable.

## III.

## CONCLUSION

The necessity of balancing the competing rights of insurance companies, to qualify the risks for which they are willing to provide indemnity, with those of insured individuals, to obtain medical care without fear of losing such benefits, dictated the nature of our decision in this case.

For these reasons then, as well as those discussed in the body of this opinion, the decision of the Circuit Court of Lewis County is reversed. Moreover, our decision entitles Administrator Wickland to a judgment as a matter of law. As there are no genuine issues of material fact, this case is remanded for the entry of summary judgment in the Administrator's favor.

Reversed and Remanded.