674 S.E.2d 197

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, Subscribing to Policy No. B0711, Plaintiffs Below, Appellants,

v.

PINNOAK RESOURCES, LLC and PINNACLE MINING CO., LLC, Defendants Below, Appellees.

No. 33898.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 7, 2008.

Decided Nov. 6, 2008.

---

338

David S. Hart, Hayden & Hart, PLLC, Beckley, Mark F. Bruckmann (Pro hac vice), Timothy G. Church (Pro hac vice), Bruckmann & Victory, LLP, New York, NY, for the Appellants, Certain Underwriters at Lloyd's, London, Subscribing to Policy No. B0711.

W. Richard Staton, Moler, Staton, Staton & Houck, LC, Mullens, Peter N. Flocos (Pro hac vice), Melissa J. Tea (Pro hac vice), Kirkpatrick & Lockhart Preston Gates Ellis, LLP, Pittsburgh, PA, for the Appellees, PinnOak Resources, LLC and Pinnacle Mining Co., LLC.

PER CURIAM:[1]

The plaintiffs below and appellants herein, Certain Underwriters at Lloyd's, London (hereinafter "Lloyd's)," appeal from an order entered April 11, 2007, by the Circuit Court of Wyoming County. By that order, the circuit court granted summary judgment to the defendants below and appellees here-

in, PinnOak Resources, LLC and Pinnacle Mining Co., LLC (hereinafter referred to collectively as "PinnOak"). Subsequently, the Circuit Court of Wyoming County entered an order on June 21, 2007, denying Lloyd's motion to alter or amend the April 11, 2007, order. In Lloyd's suit to collect a premium purportedly due under Insurance Policy No. B0711 (hereinafter "Policy B0711"), the circuit court found that the "Global Settlement Agreement and Release" (hereinafter referred to as "Settlement Agreement") represented the intent of the parties to depart from any previous agreements, and further, that the premium was barred by the Settlement Agreement. On appeal to this Court, Lloyd's argues that the premium due under Policy B0711 was not extinguished by the Settlement Agreement and that the term "payback" referred to payment of the insurance premium, not a payback of any settlement monies. Based upon the parties' arguments, the record designated for our consideration, and the pertinent authorities, we reverse and remand the decisions by the circuit court.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The parties have a long and convoluted history together. However, the facts relevant to this appeal are relatively straightforward. To understand the current litigation, it is necessary to understand a prior occasion of litigation concerning the parties. Subsection A will explain the previous insurance coverage litigation between the parties and the resulting Settlement Agreement. Subsection B will explain the subsequent insurance policy, Policy B0711, that is the subject of the current action wherein Lloyd's seeks the payment of the premium allegedly due by PinnOak under the insurance contract.

#### A. Previous Insurance Coverage and the Settlement Agreement

In 2003, PinnOak operated the Pinnacle Mine in Wyoming County, West Virginia.

---

1. Pursuant to an administrative order entered on September 11, 2008, the Honorable Thomas E. McHugh, Senior Status Justice, was assigned to sit as a member of the Supreme Court of Appeals of West Virginia commencing September 12, 2008, and continuing until the Chief Justice determines that assistance is no longer necessary, in light of the illness of Justice Joseph P. Albright.

Various insurance companies, including Lloyd's, combined to provide property insurance to PinnOak totaling $75,000,000.00. Lloyd's explained that mining risks are large risks; thus, different insurance companies combined to spread the exposure so no insurer would be inordinately impacted by a large loss. Moreover, the insurance was broken up into "layers." Each layer is a piece of the $75,000,000.00 coverage, and the layers are stacked on top of each other. Each insurer agreed to provide insurance for one layer and as soon as one layer is exhausted, the next layer would go into effect. Thus, each insurance company would only be responsible for a proportional amount of any loss incurred.

Lloyd's was one of the insurers of PinnOak in August 2003 when PinnOak experienced a series of methane ignitions at its mines located in Pineville, West Virginia. In February 2004, PinnOak filed suit against Lloyd's, and other insurers, to recover insurance proceeds allegedly due under coverage policies in effect at the time of the methane ignitions. PinnOak's suit claimed that Lloyd's[2] breached insurance policies numbered AN0300335, AN0300336, AN0300337, and AN0300338, and committed bad faith in its handling of PinnOak's August 2003 loss related to the methane explosions.

Various insurers settled with PinnOak in 2004 and 2005. The remaining insurers were the Lloyd's syndicates providing the upper layers of insurance coverage. On May 30, 2006, PinnOak and the relevant Lloyd's syndicates entered into a "Global Settlement Agreement and Release" (also referred to throughout this opinion as "Settlement Agreement"). The Lloyd's syndicates paid their respective shares of a $56,000,000.00 settlement to PinnOak as a result of the 2003 methane ignition loss.

### B. Insurance Policy B0711

During the pendency of the litigation surrounding the methane ignition coverage, Lloyd's[3] agreed to further insure PinnOak. The record contains an initial contract for insurance, purporting to extend coverage from June 30, 2004, to June 30, 2005, for a premium of $5,000,000.00. Lloyd's argues that it soon became clear to PinnOak that it would not have the necessary cash flow to pay the premium, as it was due up-front. As asserted by Lloyd's, PinnOak's agent then contacted Lloyd's and proposed some alternative terms to the insurance contract.[4]

The subsequent policy, which is the relevant policy to this appeal, is known as Policy B0711. This policy was for a term of five years, beginning June 30, 2004, and lasting through June 30, 2009. An annual premium amount of $375,000.00 was due every year, and then the amount of $1,250,000.00 would be due in five equal installments totaling $6,250,000,00, but would be deferred until after settlement of the August 2003 loss. In the event of nonrenewal, the entire amount would be due in full. Lloyd's states that this provision was PinnOak's recommendation upon realizing that it would only have positive cashflow after the 2003 event settled.[5]

PinnOak elected not to renew the policy after the first full year. Subsequent to this nonrenewal, PinnOak and Lloyd's entered into a Settlement Agreement in May 2006 regarding the coverage issues surrounding the 2003 methane ignitions. PinnOak did not pay the premiums due under Policy B0711, which provided PinnOak coverage for the period of time subsequent to the time involved in the coverage lawsuit. Lloyd's then filed the underlying lawsuit on the theory that PinnOak had breached its obligations under Policy B0711, which was to pay the premium in full since PinnOak elected to cancel the coverage after the first year, and

---

**2.** The suit was also filed against all of the other companies providing insurance coverage. To the extent that the other insurance companies are not relevant to this appeal, they are not mentioned.

**3.** Syndicates of Lloyd's agreed to provide coverage. However, this opinion will refer to the syndicates as "Lloyd's."

**4.** PinnOak neither corroborates nor denies these assertions.

**5.** *See* note 4, *supra.*

since the August 2003 incident and subsequent lawsuit had been settled.

PinnOak filed a motion to dismiss. The circuit court considered matters outside of the pleadings; thus, it converted the motion to dismiss into a motion for summary judgment and disposed of the matter pursuant to Rule 56 of the West Virginia Rules of Civil Procedure. In its decision entered April 11, 2007, the circuit court found that the Settlement Agreement represented the intent of the parties to diverge from any prior agreements. Therefore, the circuit court found that the obligations under Policy B0711 were terminated, and that PinnOak did not owe the premium agreed upon in the policy. As further support for its decision, the circuit court found that the use of the term "payback" in Policy B0711 referred to a recoupment of settlement monies, which was an action barred by the Settlement Agreement. Lloyd's then filed a motion to alter or amend judgment, which was denied by the circuit court on June 21, 2007. This appeal by Lloyd's then followed.

## II.

### STANDARD OF REVIEW

This case is before this Court on appeal from the circuit court's order granting summary judgment in favor of PinnOak, and its subsequent denial of Lloyd's motion for reconsideration pursuant to West Virginia Rules of Civil Procedure, Rule 59(e).[6] It has long been held that "[a] circuit court's entry of summary judgment is reviewed *de novo.*" Syl. pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994). Further, the same *de novo* standard of review applies to the denial of the Rule 59(e) motion to alter or amend:

"'The standard of review applicable to an appeal from a motion to alter or amend a judgment, made pursuant to W. Va. R. Civ. P. 59(e), is the same standard that would apply to the underlying judgment upon which the motion is based and from

which the appeal to this Court is filed.' Syllabus point 1, *Wickland v. American Travellers Life Insurance Co.,* 204 W.Va. 430, 513 S.E.2d 657 (1998)." Syllabus point 2, *Bowers v. Wurzburg,* 205 W.Va. 450, 519 S.E.2d 148 (1999).

Syl. pt. 1, *Alden v. Harpers Ferry Police Civil Serv. Comm'n,* 209 W.Va. 83, 543 S.E.2d 364 (2001).

Despite these longstanding principles, PinnOak urges this Court to apply an abuse of discretion standard of review rather than a *de novo* standard.[7] PinnOak contends that, because the grant of summary judgment deals with a settlement agreement, this Court has prescribed an abuse of discretion standard. *See Berardi v. Meadowbrook Mall Co.,* 212 W.Va. 377, 381, 572 S.E.2d 900, 904 (2002) (per curiam) ("Our review here is further circumscribed because it involves a settlement agreement and we have said that, 'when this Court undertakes the appellate review of a circuit court's order enforcing a settlement agreement, an abuse of discretion standard of review is employed.)' " (quoting *DeVane v. Kennedy,* 205 W.Va. 519, 527, 519 S.E.2d 622, 630 (1999)).

We decline to adopt PinnOak's argument. The cases cited by PinnOak outline a circuit court's discretion when confronted with a motion seeking to enforce a settlement agreement. While we completely agree with the propositions of law declared in those cases, we simply find them inapplicable to the present case. The present case surrounds two documents, the Settlement Agreement and Policy B0711, and what, if any, connection there is between the two documents. The Settlement Agreement in the present case is simply ancillary to the complaint that seeks to enforce PinnOak's payment of a premium allegedly due under Policy B0711. PinnOak originally filed a Rule 12(b)(6) motion to dismiss, which the circuit court converted into a motion for summary judgment. As such, this opinion will

---

6. As admitted by Lloyd's in their brief, the motion is incorrectly styled as a Rule 56(e) motion. Consequently, the circuit court's order denying the same also refers to the incorrect rule.

7. In its argument, however, PinnOak opines that the circuit court's grant of summary judgment and subsequent denial of the motion to alter or amend should be upheld regardless of the standard of review applied by this Court.

apply the *de novo* standard of review. Further guidance states that

> "[t]he interpretation of an insurance contract, including the question of whether the contract is ambiguous, is a legal determination that, like a lower court's grant of summary judgement, shall be reviewed *de novo* on appeal." Syllabus point 2, *Riffe v. Home Finders Associates, Inc.*, 205 W.Va. 216, 517 S.E.2d 313 (1999).

Syl. pt. 2, *Horace Mann Ins. Co. v. Adkins*, 215 W.Va. 297, 599 S.E.2d 720 (2004).

▆▆▆ In undertaking our *de novo* review, we apply the same standard for granting summary judgment that is applied by the circuit court:

> "'A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.' Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963)." Syllabus Point 1, *Andrick v. Town of Buckhannon*, 187 W.Va. 706, 421 S.E.2d 247 (1992).

Syl. pt. 2, *Painter*, 192 W.Va. 189, 451 S.E.2d 755. Moreover,

> [s]ummary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

Syl. pt. 4, *Painter, id.* We are also cognizant that "[t]he circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial." Syl. pt. 3, *Painter, id.* Mindful of these applicable standards, we now consider the substantive issues raised herein.

## III.

### DISCUSSION

Lloyd's advances two arguments on appeal: (1) the circuit court erred in finding that the word "payback" in Policy B0711 referred to a payback from the Settlement Agreement, and (2) the circuit court erred in finding that the Settlement Agreement released PinnOak's obligation to pay the premium due under Policy B0711. PinnOak responds and argues that (1) the circuit court was correct in finding that Lloyd's breach of contract claim against PinnOak was barred by the Settlement Agreement, (2) Lloyd's interpretation of Policy B0711 is irrelevant and unreasonable, and (3) the case should be dismissed in furtherance of this Court's longstanding policy of favoring and encouraging settlements. A discussion of the Settlement Agreement and Policy B0711, and any possible interconnection, will resolve all matters before this Court.

▆▆▆ This lawsuit began when Lloyd's sued PinnOak for breach of contract in failing to pay the premium listed in Policy B0711. In deciding this issue, the circuit court determined that the contract of insurance in Policy B0711 was extinguished by the subsequent Settlement Agreement. In so ruling, the circuit court found that

> 30. The alleged 2004 agreement [Policy B0711] was both allegedly entered into and not renewed prior to the time the parties entered into the "Global Settlement Agreement and Release." The alleged "payback" monies owed under this alleged contract appear to be an alleged attempt by [Lloyd's] to assure recovery of potential settlement monies directly resulting from the August 2003 loss. The "**GLOBAL** Settlement Agreement and Release" (emphasis added) prevents [Lloyd's] from attempting to seek reimbursement or contribution from the settlement funds resulting from the August 2003 loss. At the time the parties entered into the "Global Settlement Agreement and Release" this alleged debt would have become outstanding. The merger, anti-reimbursement and contribution, general release, and indemnification provisions of the "Global Settlement Agreement and Release" show the intent of the parties to walk away from all disputes and outstanding claims related to the

August 2003 loss.[8]

(Footnote added). We cannot agree.

 This case deals with two documents: a contract for insurance coverage known as Policy B0711 and a Settlement Agreement. As has been previously recognized, a "[s]ettlement agreement is favored by law and is to be construed as any other contract." *Floyd v. Watson*, 163 W.Va. 65, 68, 254 S.E.2d 687, 690 (1979) (internal citations omitted). *See also* Syl. pt. 1, *Burdette v. Burdette Realty Improvement, Inc.*, 214 W.Va. 448, 590 S.E.2d 641 (2003) (" 'A meeting of the minds of the parties is a *sine qua non* of all contracts.' Syl. pt. 1, *Martin v. Ewing*, 112 W.Va. 332, 164 S.E. 859 (1932)."). Relevant to all written agreements, it has long been held that

> "[a] valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." Syllabus Point 1. *Cotiga Development Co. v. United Fuel Gas Co.*, 147 W.Va. 484, 128 S.E.2d 626 (1962).

Syl. pt. 1, *Wellington Power Corp. v. CNA Sur. Corp.*, 217 W.Va. 33, 614 S.E.2d 680 (2005). Moreover, "[t]he mere fact that parties do not agree to the construction of a contract does not render it ambiguous. The question as to whether a contract is ambiguous is a question of law to be determined by the court." Syl. pt. 1, *Berkeley County Pub. Serv. Dist. v. Vitro Corp. of Am.*, 152 W.Va. 252, 162 S.E.2d 189 (1968). Further, with regard to Policy B0711, " '[w]here the provisions of an insurance policy contract are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended.' Syllabus, *Keffer v. Prudential Ins. Co.*, 153 W.Va. 813, 172 S.E.2d 714 (1970)." Syl. pt. 2, *West Virginia Fire & Cas. Co. v. Stanley*, 216 W.Va. 40, 602 S.E.2d 483 (2004).

In applying the principles of contract construction and interpretation to Policy B0711 and to the Settlement Agreement, we find that the circuit court erred in holding that there is any connection between the two documents. By extension, we also find that

**8.** The relevant provisions in the Settlement Agreement, in the order listed by the circuit court's order, state as follows:

> 10. This agreement constitutes the entire agreement between PinnOak, Insurers, and VeriClaim regarding the subject matter hereof, and supercedes all other prior discussions, agreements and understandings, both written and oral, with respect thereto. This agreement shall not be amended, modified or assigned except by express written agreement of PinnOak, Insurers, and VeriClaim.
>
> 8. Insurers shall not, under any legal theory, seek reimbursement of, or contribution toward, the advances and sum to be paid to PinnOak described in Paragraph 1 of "Agreements" above, from any other insurer or from any other present or former party to the Coverage Action, except with respect to the rights that Insurers may have with respect to reinsurers pursuant to reinsurance agreements, contracts or relationships.
>
> 4. In consideration of the agreements set forth herein, each of the Insurers and Vericlaim and their respective investors, shareholders, general and limited partners, parents, subsidiaries, successors and assigns (the "Insurer Releasors") hereby releases and discharges PinnOak as well as PinnOak's officers, directors, stockholders, parents, subsidiaries, attorneys, successors and assigns, from all actions, or causes of action whether in contract

or tort (each including but not limited to statutory or common law claims, claims for attorneys fees, unfair or improper practices or methods of competition, consumer protection acts or bad faith), suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialities, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which the Insurer Releasors ever had, now have or hereafter can, shall or may have, for, upon or by reason of the Loss. Necessarily, the release and discharge contained in this paragraph does not apply to any loss other than the Loss.

> 7. Each of the Insurers, and VeriClaim, shall protect, indemnify, and save PinnOak, its officers, directors, subsidiaries, affiliates, successors, assigns, stockholders, directors, officers, employees and agents, by policy number only, harmless from and against any and all claims, demands, liabilities and causes of actions of every kind and character brought by any party purporting to or attempting to assert any claim by, through, or on behalf of any of the Insurers or VeriClaim, growing out of, or resulting directly or indirectly from, the Loss; *provided, however*, that Insurers and VeriClaim shall have no obligations with respect to any claim asserted by another insurer or a reinsurer relating to the Loss.

344

the circuit court's determination of the meaning of the word "payback" in Policy B0711 to be unsupported. The circuit court found that provisions in the Settlement Agreement extinguished PinnOak's duty to pay the insurance premium contracted for in Policy B0711. The lower court found that "[t]he merger, anti-reimbursement and contribution, general release, and indemnification provisions of the 'Global Settlement Agreement and Release' show the intent of the parties to walk away from all disputes and outstanding claims related to the August 2003 loss." [9]

An examination of the Settlement Agreement shows that it cannot extinguish PinnOak's contractual obligation under Policy B0711. The Settlement Agreement only applies to the 2003 "Loss" as defined by the agreement. "Loss" is defined in the Settlement Agreement as

> a dispute ... over PinnOak's claim for business interruption and other losses under the aforementioned policies of insurance, as well as PinnOak's claims of bad faith by Insurers and VeriClaim relating to and/or arising out of one or more methane ignitions/explosions at the Pinnacle Mine beginning on August 31, 2003 (hereinafter referred to as the "Loss") and the subsequent claim handling and investigation.

The "Loss" definition referred to two specific insurance policies, both of which were in effect at the time of the 2003 loss. The "aforementioned policies of insurance" are the coverage policies that were in place in August 2003 at the time of the loss. The relevant policy to our determination, Policy B0711, is not included in the Settlement Agreement. Any mention of Policy B0711 is absent, even though it was entered into prior to the Settlement Agreement. The Settlement Agreement, pursuant to its own definition of the "loss" that is the subject matter of the agreement, settled the coverage action relating to the August 2003 methane ignitions. However, it did not release the parties from their agreement regarding Policy B0711.

The circuit court found that the use of the word "payback" in Policy B0711 was sufficient to tie the two documents together. In

so finding, the circuit court determined that the anti-reimbursement/contribution provision in the Settlement Agreement bars the premium due under Policy B0711 as it is money paid after settlement of the 2003 loss and is, therefore, reimbursement from settlement monies received. Supplanting the circuit court's determination, PinnOak argues that the use of the term "payback" in Policy B0711 clearly relates to the August 2003 loss, and is therefore, part of the Settlement Agreement. Further, PinnOak avers that because Policy B0711 was entered into approximately two years before the Settlement Agreement, the Settlement Agreement encompasses and extinguishes the terms of the Policy B0711.

However, a true reading of Policy B0711 clearly shows that use of the word "payback" in Policy B0711 refers to a payback of the premium due that was held in abeyance until such time as PinnOak would have positive cashflow. The settlement of the August 2003 methane ignitions loss was the only event that would lead to PinnOak having the necessary cash, so it was listed as the "triggering" event. Thus, the settlement was the trigger necessitating payment of the premium. It was not a recoupment or recovery of any of the settlement monies received by PinnOak.

In fact, a fair reading of the insurance policy shows that Lloyd's insured PinnOak at great risk to itself. Under the terms of the contract, PinnOak only owed the first installment after settlement of the August 2003 loss. Such a condition may never have come to fruition. If no settlement had been reached, then PinnOak would have received insurance coverage without ever paying the large premium for such coverage. Moreover, in Policy B0711, under the heading *"PRE-MIUM:"*, it is clear that the $1,250,000.00 annual premiums are "Payback Annual, payable on settlement of the August 2003 loss[.]" This language emphasizes that this payback is of the annual premium, not a recoupment of settlement monies. While the policy is clear that the August 2003 settlement is a triggering factor leading to PinnOak's obligation to pay its premium, the payback of the

---

**9.** *See* note 8, *infra.*

premium is *not* a recoupment of settlement monies. Further, as is clear from the policy, this money was not due until after settlement monies were received. Indeed, it was two years later, in May 2006, when the settlement occurred. Thus, the term "payback" refers to PinnOak paying Lloyd's the premium for the coverage that PinnOak has *already* received from Lloyd's, but for which payment has been deferred.

This interpretation is reinforced by examining the two versions of Policy B0711 issued in 2004. The first policy was entered into for a term of one year from June 30, 2004, to June 30, 2005, with a premium due of $5,000,000.00. This policy does not contain the term "payback" or any references to the August 2003 loss. However, when PinnOak discovered it would not have the cash flow to pay this premium up-front, the terms were altered such that it was a five-year term from June 30, 2004, to June 30, 2009, with options of nonrenewal; a guaranteed $375,000.00 per year in premiums; and a premium of $6,250,000.00, payable in five equal installments of $1,250,000.00, after receipt of the settlement money from the 2003 loss. This scheme acknowledged that PinnOak would repay Lloyd's for the coverage that it received for almost free [10] prior to the time that the 2003 case settled.

Quite simply, the subject matter of the Settlement Agreement refers to only the "Loss," which is the 2003 methane explosion and the subsequent coverage litigation. Policy B0711 is an after-entered policy of insurance affording insurance coverage from Lloyd's to PinnOak. Contractual obligations under Policy B0711 were not included in, or extinguished by, the Settlement Agreement. Thus, PinnOak's premium obligations under Policy B0711 are due.

▆▆▆▆▆ As a final matter, PinnOak contends that the Settlement Agreement should be enforced pursuant to this State's longstanding public policy of favoring and encour-

aging settlement agreements. PinnOak argues that the language of the Settlement Agreement is clear and unambiguous and should be enforced as written. Further averred by PinnOak is that, in the absence of any fraud, mistakes, or material misrepresentations, the agreement must be enforced. We recognize our longstanding principle that

> "[t]he law favors and encourages the resolution of controversies by contracts of compromise and settlement rather than by litigation; and it is the policy of the law to uphold and enforce such contracts if they are fairly made and are not in contravention of some law or public policy." Syl. Pt. 1, *Sanders v. Roselawn Mem'l Gardens, Inc.*, 152 W.Va. 91, 159 S.E.2d 784 (1968).

Syl. pt. 5, *Riner v. Newbraugh*, 211 W.Va. 137, 563 S.E.2d 802 (2002). Further, " '[w]here parties have made a settlement ..., such settlement is conclusive upon the parties thereto as to the correctness thereof in the absence of accident, mistake or fraud in making the same.' Syllabus point 1, in part, *Calwell v. Caperton's Adm'rs*, 27 W.Va. 397 (1886)." Syl. pt. 7, *DeVane v. Kennedy*, 205 W.Va. 519, 519 S.E.2d 622 (1999).

This opinion does nothing to alter or change our longstanding law regarding settlement agreements. Courts should favor and encourage settlement agreements. This opinion does nothing to void or lesson the validity of the Settlement Agreement entered into in May 2006. However, this opinion confines the Settlement Agreement to its actual terms and refuses to expand the Settlement Agreement beyond its plain terms to extinguish the contractual obligations in Policy B0711. PinnOak breached its duty to pay the premium it owed under Policy B0711. PinnOak entered into a contract for insurance coverage and has breached its duty to pay the premiums as agreed to in the policy. Thus, PinnOak is required to pay the premium.[11]

**10.** This interpretation does not attempt to obscure the fact that PinnOak did pay $375,000.00 a year in premiums that was not contingent on receipt of the settlement monies. Thus, while the coverage was not free, it was much below the market value as evidenced by the original agree-

ment terms with a premium of $5,000,000.00 for one year of coverage in Policy B0711.

**11.** While this opinion determines that PinnOak owes the premium under Policy B0711, this Court does not make a determination as to the actual amount owed and to whom. There is

## IV.

## CONCLUSION

For the foregoing reasons, we reverse the April 11, 2007, and the June 21, 2007, orders entered by the Circuit Court of Wyoming County. We remand this matter for further proceedings consistent with this opinion.

Reversed and Remanded.

Justice ALBRIGHT not participating

Senior Status Justice McHUGH, sitting by temporary assignment.

some evidence in the record that Lloyd's insured only a percentage of the risk. Thus, the premium owed to Lloyd's should be calculated accordingly on remand.