# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

Fall 2025 Term

_____

No. 25-ICA-16

_____

FILED

**November 13, 2025**

released at 3:00 p.m.
ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, ALLIANZ GLOBAL RISKS US INSURANCE COMPANY, ACE AMERICAN INSURANCE COMPANY, ZURICH AMERICAN INSURANCE COMPANY, GREAT LAKES INSURANCE SE, XL INSURANCE AMERICA, INC., GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA, ASPEN INSURANCE UK LIMITED, NAVIGATORS MANAGEMENT COMPANY, INC., IRONSHORE SPECIALTY INSURANCE COMPANY, VALIDUS SPECIALTY UNDERWRITING SERVICES, INC., AND HDI-GERLING AMERICA INSURANCE COMPANY,
Defendants Below, Petitioners,

v.

WESTLAKE CHEMICAL CORPORATION AND AXIALL CORPORATION,
Plaintiffs Below, Respondents.
_____

Appeal from the Circuit Court of Marshall County, West Virginia
Business Court Division
The Honorable Christopher C. Wilkes, Judge
Civil Action No. CC-25-2019-C-59

AFFIRMED IN PART, REVERSED IN PART,
VACATED IN PART, and REMANDED

_____

Submitted:  September 16, 2025
Filed:  November 13, 2025

Jeffrey M. Wakefield, Esq.
Flaherty Sensabaugh Bonasso, PLLC
Charleston, West Virginia

Debra Tedeschi Varner, Esq.
James A. Varner, Sr., Esq.
Varner & Van Volkenburg PLLC
Clarksburg, West Virginia

Myles A. Parker, Esq. (Pro Hac Vice)
Alexandra F. Markov, Esq. (Pro Hac Vice)
Justin M. Sumrall, Esq. (Pro Hac Vice)
Jacob T.E. Stutzman, Esq. (Pro Hac Vice)
Carroll Warren & Parker PLLC
Jackson, Mississippi

Counsel for Petitioners

Jeffrey V. Kessler, Esq.
Berry, Kessler, Crutchfield, Taylor &
Gordon
Moundsville, West Virginia

Travis L. Brannon, Esq.
John M. Sylvester, Esq. (Pro Hac Vice)
David R. Osipovich, Esq. (Pro Hac Vice)
Jessica L.G. Moran, Esq. (Pro Hac Vice)
Lukus P. Freeman, Esq. (Pro Hac Vice)
K&L Gates LLP
Pittsburgh, Pennsylvania

Counsel for Respondents

_____

AND

_____

No. 25-ICA-17

_____

WESTLAKE CHEMICAL CORPORATION AND AXIALL CORPORATION,
Plaintiffs Below, Petitioners,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,
ALLIANZ GLOBAL RISKS US INSURANCE COMPANY, ACE AMERICAN
INSURANCE COMPANY, ZURICH AMERICAN INSURANCE COMPANY, GREAT
LAKES INSURANCE SE, XL INSURANCE AMERICA, INC., GENERAL
SECURITY INDEMNITY COMPANY OF ARIZONA, ASPEN INSURANCE UK
LIMITED, NAVIGATORS MANAGEMENT COMPANY, INC., IRONSHORE
SPECIALTY INSURANCE COMPANY, VALIDUS SPECIALTY UNDERWRITING
SERVICES, INC., AND HDI-GERLING AMERICA INSURANCE COMPANY,
Defendants Below, Respondents.

_____

Appeal from the Circuit Court of Marshall County, West Virginia
Business Court Division
The Honorable Christopher C. Wilkes, Judge
Civil Action No. CC-25-2019-C-59

AFFIRMED IN PART, REVERSED IN PART,
VACATED IN PART, and REMANDED

_____

Submitted:  September 16, 2025
Filed:  November 13, 2025

Jeffrey V. Kessler, Esq.
Berry, Kessler, Crutchfield, Taylor & Gordon
Moundsville, West Virginia

Travis L. Brannon, Esq.
John M. Sylvester, Esq. (Pro Hac Vice)
David R. Osipovich, Esq. (Pro Hac Vice)
Jessica L.G. Moran, Esq. (Pro Hac Vice)
Lukus P. Freeman, Esq. (Pro Hac Vice)
K&L Gates LLP
Pittsburgh, Pennsylvania

Counsel for Petitioners

Jeffrey M. Wakefield, Esq.
Flaherty Sensabaugh Bonasso, PLLC
Charleston, West Virginia

Debra Tedeschi Varner, Esq.
James A. Varner, Sr., Esq.
Varner & Van Volkenburg PLLC
Clarksburg, West Virginia

Myles A. Parker, Esq. (Pro Hac Vice)
Alexandra F. Markov, Esq. (Pro Hac Vice)
Justin M. Sumrall, Esq. (Pro Hac Vice)
Jacob T.E. Stutzman, Esq. (Pro Hac Vice)
Carroll Warren & Parker PLLC
Jackson, Mississippi

Counsel for Respondents

CHIEF JUDGE LORENSEN delivered the Opinion of the Court.

LORENSEN, CHIEF JUDGE:

In this cross-appeal, the parties dispute insurance coverage for a chlorine spill that occurred at a chemical plant in Natrium, West Virginia. The owners of the plant maintain that the damages caused by the spill were covered under policies of insurance issued by multiple insurance companies, and that their claim should not be limited by the amount awarded in a verdict in a related Pennsylvania lawsuit. The insurers argue that the claim is excluded under the policies, and that even if it is covered, the damages should be limited and reduced by the amount the plant owners recovered in that related Pennsylvania action. The parties also dispute whether the owners are entitled to prejudgment interest. Based upon our review of the record and applicable law, we affirm in part, reverse in part, vacate in part, and remand.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In early 2016, Axiall Corporation, a chemical company operating a manufacturing plant in Natrium, West Virginia (the "Natrium Plant"), sent a thirty-seven-year-old railroad tank car to a repair facility in DuBois, Pennsylvania. Three companies (collectively referred to as the "Maintenance Vendors"), none of whom is a party to this appeal, participated in the repairs.[1] After completing the repairs, the Maintenance Vendors returned the tank car to the Natrium Plant in the summer of 2016. On August 27, 2016,

---

[1] Rescar, Inc. repaired the tank car. Rescar's subcontractor Superheat FGH Services, Inc. monitored the repair work. AllTranstek, LLC inspected the completed repairs.

1

Axiall filled the tank car for the first time following the repair. Minutes later, the tank car ruptured, releasing approximately ninety tons of liquid chlorine. As the liquid chlorine encountered the air, it vaporized, forming a cloud that traveled throughout the plant. On August 30, 2016, Axiall notified its insurers of its claim for damages arising from the chlorine spill. The following day, Westlake Chemical Corporation ("Westlake") acquired Axiall.[2]

At the time of the August 27, 2016, incident, Westlake was insured under an insurance program comprised of thirteen policies ("the Policies") issued by twelve insurers: National Union Fire Insurance Company of Pittsburgh, PA, ("National Union"), Allianz Global Risks US Insurance Company, Ace American Insurance Company, Zurich American Insurance Company, Great Lakes Insurance SE, XL Insurance America, Inc., General Security Indemnity Company of Arizona, Aspen Insurance UK LTD, Navigators Management Company, Inc., Ironshore Specialty Insurance Company, Validus Specialty Underwriting Services, Inc., and HDI-Gerling America Insurance Company (collectively the "Insurers"). Each insurer held "quota shares" of Westlake's insurance program.

Subject to their conditions and exclusions, these insurance policies provided coverage for "All Risks of Direct physical loss or damage." The Policies include three exclusions relevant to this matter: a "corrosion exclusion," a "faulty workmanship

---

[2] For simplicity, Axiall and Westlake (Respondents in 25-ICA-16 and Petitioners in 25-ICA-17) hereinafter will be referred to collectively as "Westlake."

2

exclusion," and a "pollution exclusion." The corrosion and faulty workmanship exclusions

are included in Section B.3 of the Policies, which provides as follows:

> This policy does not insure against loss, damage or expense caused by or resulting from:
>
> ***
>
> C. Loss or damage from wear and tear, rust, corrosion, erosion, depletion or gradual deterioration, but not excluding resultant physical loss or damage from a covered peril;
>
> D. Loss or damage from inherent vice, faulty methods of construction, errors or omissions in plan or specification design or errors in processing, latent defect, faulty materials, or workmanship. This exclusion does not apply to resultant physical loss or damage not otherwise excluded[.]

The pollution exclusion is included in Endorsement 1 of the Policies, and provides as

follows:

> Notwithstanding any provision in the Policy to which this Endorsement is attached, this Policy does not insure against loss, damage, costs or expenses in connection with any kind or description of seepage and/or pollution and/or contamination, direct or indirect, arising from any cause whatsoever.
>
> ***
>
> However, if the insured property is the subject of direct physical loss or damage for which this company has paid or agreed to pay then this Policy (subject to its terms, conditions and limitations) insures against direct physical loss or damage to the property insured hereunder caused by resulting seepage and/or pollution and/or contamination.

In addition to this pollution exclusion included in all the Policies, the National Union policy

includes a separate pollution exclusion:

3

This policy does not cover loss or damage caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of CONTAMINANTS or POLLUTANTS, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any physical damage insured by this policy.

This exclusion defines contaminants or pollutants in part as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste, which after its release . . . threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder."

The "Basis of Recovery" provision in the Policies provides that Westlake is entitled to recover for damage to "[m]achinery and equipment at functional replacement cost, defined as the cost of equipment used to replace equipment insured which has been lost or damaged by an insured peril." The Policies also included a "Proof of Loss" clause that provides that "[u]pon [the Insurers'] request [Westlake] shall exhibit the damaged property to [the Insurers], . . . and produce for [the Insurers'] examination all pertinent records and sales invoices." The Policies require that Georgia law controls their interpretation. Westlake's claims under these Policies were subject to a $3,750,000 property damage deductible.

In the immediate aftermath of the chlorine spill, Westlake retained engineering consultant Exponent, Inc., to investigate the cause of the incident and advise on mitigation of damages. Westlake did not disclose its retention of Exponent to the

4

Insurers. Around the same time, the Insurers retained Engineering Design & Testing Corp. ("ED&T") to serve as technical consultants in evaluating the loss. The National Transportation Safety Board (NTSB) also sent a team to investigate the tank car.

In December of 2017, ED&T issued a report on the damage to the Natrium Plant, estimating that the cost of repairs would be between $220,000,000 and $404,000,000. After this estimate, the Insurers retained outside coverage counsel and hired additional technical experts to evaluate the claim. On January 18, 2018, the Insurers issued a reservation of rights letter to Westlake, explaining that the corrosion exclusion, the faulty workmanship exclusion, and the pollution exclusion might preclude coverage. On January 26, 2018, the adjuster requested various items from Westlake, including any pre-incident photographs of the Natrium Plant as well as the results of any post-incident analysis of damaged property.

Westlake submitted, via letter dated May 22, 2018, a partial proof of loss to the Insurers for $5,764,231. This communication was the first time Westlake claimed damages arising from the chlorine spill exceeding the $3,750,000 deductible. Westlake noted, in this letter, that it would make additional submissions with updated damage amounts as additional costs were incurred for repairs. While the claim adjustment negotiations continued, on August 24, 2018, Westlake filed a lawsuit in the Pennsylvania Court of Common Pleas against the Maintenance Vendors (the "Pennsylvania Action"),

5

alleging that their negligent repairs caused the tank car rupture, the subsequent release of chlorine, and the resulting damage to the Natrium Plant.

In November of 2018, Westlake provided pre-incident photographs of the Natrium Plant to the Insurers for the first time. On December 19, 2018, the Insurers' technical consultants presented their findings and opinions on the damage to the Natrium Plant, concluding that much of the corrosion damage predated the August 27, 2016, chlorine spill. On January 28, 2019, the Insurers notified Westlake, through their adjuster, that they were denying Westlake's May 22, 2018, proof of loss under the Policies' corrosion, faulty workmanship, and pollution exclusions. On March 20, 2019, Westlake submitted another proof of loss, this time claiming $278,505,078 in damage.

On April 9, 2019, the Insurers denied Westlake's updated claim, relying on the same exclusions noted in its January 28, 2019, letter. In conjunction with this denial, the Insurers, on April 9, 2019, filed a declaratory judgment action in Delaware state court, seeking a declaration that Westlake's claim was not covered. On April 10, 2019, Westlake filed the underlying action in the Circuit Court of Marshall County, raising five claims: (1) Declaratory Judgment; (2) Breach of Contract; (3) Bad Faith Under Georgia Law; (4) Bad Faith Under West Virginia Law; and (5) Statutory Bad Faith Under the West Virginia Unfair Trade Practices Act. The Delaware Court deferred to the Circuit Court of Marshall County and stayed the Delaware action. The underlying action was subsequently transferred to the Business Court Division.

6

On October 22, 2019, the circuit court in the underlying action, sua sponte, entered its order finding that West Virginia law governed the issue of bad faith and dismissing Count III (Georgia Bad Faith) of the complaint. The Insurers filed a petition for a writ of prohibition seeking to prohibit the circuit court from enforcing this order and asking the Supreme Court of Appeals of West Virginia ("SCAWV") to determine that Georgia law applied to all of Westlake's claims. The SCAWV granted the writ in part, vacating the circuit court's order, but declined to find that Georgia law applied to all claims. *See State ex rel. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hummel*, 243 W. Va. 681, 686, 850 S.E.2d 680, 685 (2020). On remand, the circuit court determined that Georgia law applied to all claims and dismissed Counts IV (West Virginia Bad Faith) and V (West Virginia UTPA Bad Faith) of the complaint.

After a period of discovery, in September of 2021, the parties filed competing motions for summary judgment on the applicability of the corrosion, faulty workmanship, and pollution exclusions. On November 19, 2021, the circuit court entered three separate orders—one for each exclusion—ruling that each exclusion did not apply, granting Westlake's motions for summary judgment, and denying the Insurers' motions for summary judgment.

In its corrosion summary judgment order, the circuit court noted that it was undisputed that Westlake's claim was for expenses associated with replacing corroded equipment. However, the circuit court found that the corrosion exclusion did not apply, as

a matter of law, for two reasons. First, the circuit court relied on the final clause in the exclusion, "but not excluding resultant physical loss or damage from a covered peril," and reasoned that under that clause "the resultant corrosion damage from the covered chlorine release peril would not be excluded." The court also found that in this case, corrosion was the type of damage, not the cause of loss, and that this exclusion only barred coverage where corrosion was the cause of loss. Accordingly, the circuit court denied the Insurers' motion for summary judgment on the corrosion exclusion, granted Westlake's motion for partial summary judgment on the corrosion exclusion, and struck the Insurers' seventeenth affirmative defense to the extent it raised the corrosion exclusion.

In its faulty workmanship summary judgment order, the circuit court found that the exclusion did not apply based on the "ensuing loss" provision in the last sentence of the exclusion. The circuit court reasoned that, even assuming that the faulty workmanship and repair by the Maintenance Vendors resulted in a defect in the tank car, the subsequent rupture of the car and chlorine spill would be a "resultant physical loss or damage not otherwise excluded." Accordingly, the circuit court denied the Insurers' motion for summary judgment on the faulty workmanship exclusion, granted Westlake's motion for partial summary judgment on the faulty workmanship exclusion, and struck the Insurers' seventeenth affirmative defense to the extent it raised the faulty workmanship exclusion.

8

In its pollution summary judgment order, the circuit court found that the pollution exclusion in Endorsement 1 of the Policies did not apply because it was intended only to exclude environmental pollution or contamination. The circuit court recognized that the phrase "seepage and/or pollution and/or contamination" is not defined in the Policies, but noted that it is characterized as a form of environmental impairment in a separate "Authorities Exclusion," included in Endorsement 1 of the Policies, which provides:

> This Policy does not cover expenses, fines, penalties or court costs, incurred or sustained by the Insured or imposed on the Insured at the order of any government agency, court or other authority, in connection with any kind or description of environmental impairment, including seepage or pollution or contamination from any cause.

The circuit court also noted that there was a section titled "Pollutant Cleanup and Removal (Land & Water)" in Endorsement 1 of the Policies. Considering this other language in Endorsement 1 related to environmental pollution, the circuit court found that the pollution exclusion was "clearly designed to address environmental pollution or contamination[.]"

The circuit court also found that, even if the chlorine spill constituted pollution or contamination under the Policies, the exclusion would be inapplicable pursuant to its exception:

> However, if the insured property is the subject of direct physical loss or damage for which this company has paid or agreed to pay then this Policy (subject to its terms, conditions and limitations) insures against direct physical loss or damage to the property insured hereunder caused by resulting seepage and/or pollution and/or contamination.

9

The circuit court reasoned that the tank car rupture itself was a covered peril under the policy, and that because the chlorine spill was caused by that peril, this exception to the exclusion applied. Finally, the circuit court concluded that the additional pollution exclusion, only included in the National Union policy, was also intended to address environmental pollution or contamination and did not bar Westlake's claim. Accordingly, the circuit court denied the Insurers' motion for summary judgment on the pollution exclusions, granted Westlake's motion for partial summary judgment on the pollution exclusions, and struck the Insurers' seventeenth affirmative defense to the extent it raised the pollution exclusions.

The Insurers filed an appeal from these three November 19, 2021, summary judgment orders. However, the SCAWV determined that these three orders were interlocutory and dismissed the appeal for lack of jurisdiction. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Westlake Chem. Corp.*, 249 W. Va. 575, 584, 900 S.E.2d 1, 10 (2024).

During the pendency and disposition of the summary judgment motions on the applicability of the exclusions, Westlake's Pennsylvania Action against the Maintenance Vendors proceeded to trial. In October of 2021, the jury returned a verdict in favor of Westlake in the amount of $12,800,000. In reaching that amount, the jury

10

specifically found $5,900,000 in damage to the Natrium plant and equipment.[3] On November 21, 2021, the Insurers filed a motion for partial summary judgment in this matter, seeking a ruling under the principle of collateral estoppel that the Pennsylvania jury's verdict finding $5,900,000 in damage to the Natrium Plant established the amount of damage to the Plant, and therefore the value of Westlake's claim under the Policies, in this action. On March 3, 2022, the circuit court entered an order granting this motion. The circuit court found that Pennsylvania law governed the issue of collateral estoppel, and that all of the elements of collateral estoppel were satisfied. Accordingly, the circuit court ruled that Westlake's claim for damage to the Natrium Plant and equipment had been determined to be $5,900,000 as a matter of law, prior to the application of the $3,750,000 deductible. Westlake subsequently filed a Rule 59(e) Motion to Alter or Amend this order, which the circuit court denied in an order entered on January 24, 2023.

Also on November 21, 2021, the Insurers filed a motion for summary judgment on Westlake's bad faith claim. The Insurers argued that under Georgia law, summary judgment is proper on a bad faith claim where there is no evidence of an unfounded reason for the denial of a claim, or if the issue of liability is close. Westlake argued that whether the Insurers acted in bad faith was a factual issue for the jury. On May 8, 2024, the circuit court entered an order granting this motion. The circuit court found that

---

[3] After the disposition of post-trial motions, the trial court entered judgment on August 10, 2022. The jury's verdict was subsequently affirmed on appeal. *See Axiall Corp. v. AllTranstek LLC*, 323 A.3d 180 (Pa. Super. Ct.), *appeal denied*, 331 A.3d 915 (Pa. 2024).

11

the Insurers had "legitimate, reasonable grounds to deny the claim in the application of various exclusions." The circuit court also noted that the Insurers had reasonably relied on the advice of their technical experts in denying the claim.

On September 3, 2024, the Insurers filed a motion for set-off, requesting that the judgment awarded in the Pennsylvania Action be set off against any judgment awarded in this action. Westlake filed a response, arguing that such a set-off is not permitted by the Policies or Georgia law, and that the Insurers must instead proceed under the Policies' subrogation provisions. On December 10, 2024, the circuit court entered its order denying the Insurers' motion for set-off. The circuit court recognized that under Georgia law, parties are only entitled to one recovery for their damages, but determined that Georgia's statutes governing set-offs, including Georgia Code § 13-7-4 (1933),[4] only provided for set-offs of debts or judgments between the parties themselves. Thus, the circuit court ruled that the Insurers must instead proceed under the Policies' subrogation provisions.

Also on September 3, 2024, Westlake filed a motion for summary judgment on its declaratory judgment and breach of contract claims, and additionally requested an award of prejudgment interest. Westlake argued that it was entitled to judgment on these claims because the Policies were valid contracts, the Insurers had breached by not paying Westlake's claim, and that the circuit court had already determined in its prior summary

---

[4] "Setoff must be between the same parties and in their own right." Ga. Code § 13-7-4 (1933).

12

judgment orders that the claim was covered and not subject to any of the Insurers' claimed exclusions. Westlake argued that the court should exercise its discretion to award prejudgment interest because the Insurers' continued delay in payment had deprived Westlake of insurance proceeds for more than six years. Westlake argued that prejudgment interest should be awarded from June 21, 2018, thirty days after the May 22, 2018, partial proof of loss. In their response, the Insurers argued that they had not breached the Policies, and that Westlake was not entitled to coverage because it had not cooperated with the Insurers in their investigation of the claims, as required by the "Proof of Loss" clause in the Policies. The Insurers specifically pointed to Westlake's failure to timely provide the Insurers with documentation necessary to evaluate the damages caused by the spill, including the pre-incident photographs and the report of Westlake's retained consultant Exponent. The Insurers also asked the circuit court to deny Westlake's request for prejudgment interest.

On December 10, 2024, the circuit court entered its order granting Westlake's motion for partial summary judgment. The circuit court found that Westlake made a covered claim under the Policies and that the Insurers failed to pay, breaching the contract. The circuit court also rejected the Insurers' argument that Westlake failed to cooperate, noting that any delay in the investigation did not change the fact that the loss was covered and that the Insurers failed to pay. The court also found that the Insurers' argument on Westlake's failure to cooperate was untimely, in that it was not raised as an affirmative defense or argued in the earlier summary judgment briefing. Therefore, the

13

circuit court awarded Westlake $2,150,000 in breach of contract damages, after subtracting the deductible of $3,750,000 from the previously established $5,900,000 valuation of Westlake's claim. Additionally, the circuit court granted prejudgment interest under Georgia Code § 13-6-13;[5] however, rather than awarding prejudgment interest from June 21, 2018, as requested by Westlake, it ordered prejudgment interest from August 10, 2022, the date of the entry of judgment in the Pennsylvania Action. The circuit court found that this was the date damages were determined and known to the Insurers.

The circuit court also noted that, with the declaratory judgment and breach of contract claims resolved, there was nothing left to be done in the matter. Accordingly, the circuit court designated the December 10, 2024, order as a final order and removed the matter from its active docket.

The Insurers and Westlake subsequently filed these cross-appeals.[6] The Insurers appeal from the circuit court's three November 19, 2021, summary judgment orders on the exclusions, the December 10, 2024, order denying set-off, and the December 10, 2024, order granting Westlake's motion for summary judgment on the declaratory judgment and breach of contract claims and granting prejudgment interest. Westlake

---

[5] "In all cases where an amount ascertained would be the damages at the time of the breach, it may be increased by the addition of legal interest from that time until the recovery." Ga. Code § 13-6-13.

[6] Each side filed a respondent's brief in opposition to the other's appeal, and each side filed a reply brief in support of its own.

14

appeals from the circuit court's March 3, 2022, order granting the Insurers' motion for summary judgment on collateral estoppel and the January 24, 2023, order denying Westlake's motion to alter or amend, the May 8, 2024, order granting the Insurers' motion for summary judgment on Westlake's bad faith claim, and the December 10, 2024, order granting Westlake's motion for summary judgment on the declaratory judgment and breach of contract claims and granting prejudgment interest.[7]

## II. STANDARD OF REVIEW

This Court's appellate review of a circuit court's order granting summary judgment is *de novo*. *See* Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). Similarly, "[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995). The SCAWV has also determined that "[t]he interpretation of an insurance contract, including the question of whether the contract is ambiguous, is a legal determination that, like a lower court's grant of summary [judgment], shall be reviewed *de novo* on appeal." *See* Syl. Pt. 2, *Riffe v. Home Finders Assoc., Inc.*, 205 W. Va. 216, 517 S.E.2d 313 (1999).

---

[7] Contemporaneous with this opinion, this Court entered an order consolidating these two appeals (25-ICA-16 and 25-ICA-17) for purposes of consideration and decision.

"The standard of review applicable to an appeal from a motion to alter or amend a judgment, made pursuant to W. Va. R. Civ. P. 59(e), is the same standard that would apply to the underlying judgment upon which the motion is based and from which the appeal to this Court is filed." Syl. Pt. 1, *Wickland v. Am. Travellers Life Ins. Co.*, 204 W. Va. 430, 513 S.E.2d 657 (1998). "In reviewing a circuit court's award of prejudgment interest, we usually apply an abuse of discretion standard. When, however, a circuit court's award of prejudgment interest hinges, in part, on an interpretation of our decisional or statutory law, we review *de novo* that portion of the analysis." Syl. Pt. 14, *Tri-State Petroleum Corp. v. Coyne*, 240 W. Va. 542, 814 S.E.2d 205 (2018) (quoting Syl. Pt. 2, *Hensley v. W. Va. Dep't of Health & Human Res.*, 203 W. Va. 456, 508 S.E.2d 616 (1998)).

## III.    DISCUSSION

In these consolidated appeals, the Insurers raise six assignments of error, while Westlake raises three. We will address each in turn, beginning with the Insurers' arguments; however, we have consolidated and reordered some assignments of error to accord with our analysis. *See Tudor's Biscuit World of Am. v. Critchley*, 229 W. Va. 396, 402, 729 S.E.2d 231, 237 (2012) (per curiam) (consolidating assignments of error).

### A. The Policy Exclusions

The Insurers' first four assignments of error challenge the circuit court's November 19, 2021, summary judgment orders addressing the applicability of the Policies' faulty workmanship, pollution, and corrosion exclusions. The Insurers contend that the

16

circuit court erred in finding that each of these exclusions was inapplicable, in granting Westlake's motion for summary judgment on each exclusion, and in denying the Insurers' corresponding motion on each exclusion. The Insurers also argue that, even to the extent the circuit court correctly found that the exclusions did not apply, it erred in completely striking the Insurers' seventeenth affirmative defense to the extent it was based on these exclusions.

As set forth above, it is undisputed that the substantive law of Georgia controls our interpretation of the Policies. Therefore, we must decide the substantive issues in this case as we believe a Georgia court would resolve them, "similar to a federal court sitting in diversity." *Fed. Ins. Co. v. Neice*, 247 W. Va. 566, 568, 884 S.E.2d 863, 865 (2023) (quoting *Lucero v. Valdez*, 884 P.2d 199, 204 (Ariz. Ct. App. 1994)).

"Insurance in Georgia is a matter of contract and the parties to the contract of insurance are bound by its plain and unambiguous terms." *Hurst v. Grange Mut. Cas. Co.*, 470 S.E.2d 659, 663 (Ga. 1996) (citing *Richards v. Hanover Ins.*, 299 S.E.2d 561 (Ga. 1983)). "Where the contractual language unambiguously governs the factual scenario before the court, the court's job is simply to apply the terms of the contract as written, regardless of whether doing so benefits the carrier or the insured." *Reed v. Auto-Owners Ins. Co.*, 667 S.E.2d 90, 92 (Ga. 2008). A policy provision is ambiguous "if its terms are subject to more than one reasonable interpretation." *State Farm Mut. Auto. Ins. Co. v. Staton*, 685 S.E.2d 263, 265 (Ga. 2009). "When an insurance contract is deemed to be

17

ambiguous, it will be construed liberally against the insurer and most favorably for the insured." *Id.* Interpretation of a contract is ordinarily an issue for the court, even when the contract is ambiguous. *See Envision Printing, LLC v. Evans*, 786 S.E.2d 250, 252 (Ga. Ct. App. 2016). However, "[a] jury may be required to resolve the meaning of ambiguous language, but only if an ambiguity remains after the court applies the rules of construction." *First Acceptance Ins. Co. of Georgia, Inc. v. Hughes*, 826 S.E.2d 71, 75 (Ga. 2019). Additionally, "[w]here any matter of fact is involved, the jury should find the fact." Ga. Code § 13-2-1. With these principles in mind, we address the Insurers' challenges to the circuit court's rulings on the exclusions.

### 1. The Faulty Workmanship Exclusion

The Insurers argue that the circuit court erred in concluding that the faulty workmanship exclusion did not bar Westlake's claim. As set forth above, that exclusion provides that the Policies "[do] not insure against loss, damage or expense caused by or resulting from . . . inherent vice, faulty methods of construction, errors or omissions in plan or specification design or errors in processing, latent defect, faulty materials, or workmanship." However, this exclusion also includes an "ensuing loss" clause, which provides that "[t]his exclusion does not apply to resultant physical loss or damage not otherwise excluded." The Insurers raise two primary points in arguing that the circuit court erred in finding that the faulty workmanship exclusion did not bar Westlake's claim. First, the Insurers contend that the faulty workmanship exclusion applies because the undisputed facts show that the Maintenance Vendors' negligent repairs to the tank car caused the

18

rupture. Next, they argue that the ensuing loss clause in that exclusion does not apply to preserve coverage for the subsequent chlorine spill and the damage it caused.

We find it unnecessary to resolve the first part of the Insurers' argument because the applicability of the ensuing loss clause is dispositive. Although Westlake disputes the Insurers' argument that the Maintenance Vendors' negligent repairs caused the tank car rupture, both in its brief and at oral argument,[8] Westlake clarified that it was not seeking coverage for the damage to the tank car. Instead, Westlake seeks coverage for the damage to the Natrium Plant caused by the subsequent chlorine spill. Therefore, even assuming the Maintenance Vendors' "workmanship" caused the tank car to rupture, to the extent the subsequent damage from the chlorine spill was "resultant physical loss or damage not otherwise excluded," the faulty workmanship exclusion would not bar Westlake's claim. Accordingly, our analysis turns on the meaning of "resultant physical loss or damage not otherwise excluded."

In interpreting this language and finding that the ensuing loss clause applied in this case, the circuit court relied on a Georgia federal district court's explanation that an ensuing loss clause applies "where an excluded cause of loss, e.g., an earthquake, may both independently cause damage and result in a fire, an occurrence that is a covered cause of

---

[8] In its response brief, Westlake explained its "claimed damage is not the mis-repaired tank car, but rather the damage to the equipment at the Natrium Plant." At oral argument, Westlake's counsel reiterated that it was not seeking coverage for damage to the tank car and that the damage it is claiming falls entirely under the ensuing loss clause.

19

loss. In that situation the direct earthquake damage would not be insured but the ensuing fire damage would be insured." *Mock v. Cent. Mut. Ins. Co.*, 158 F. Supp. 3d 1332, 1341 (S.D. Ga. 2016) (citation modified). The circuit court concluded that a chlorine spill is a covered peril under the Policies, and that because it was "a covered peril that ensued, or resulted, from any alleged faulty workmanship on the part of the maintenance vendors, the Court finds [the ensuing loss clause] preserves coverage for all the damages [this] covered peril[] caused."[9]

The Insurers contend that the circuit court's view of the ensuing loss provision was too broad, and that this Court should find that the ensuing loss clause only applies to unforeseeable independent perils not directly related to faulty workmanship. As they put it, "[t]he direct, foreseeable consequence of faulty workmanship cannot be recast as a separate event to avoid the application of the Faulty Workmanship Exclusion." Under this view, because the Maintenance Vendors' negligent repairs caused the tank car rupture, and the rupture directly caused the chlorine spill, the negligent repairs also caused the chlorine spill. Therefore, the damage to the Natrium Plant from the chlorine spill was also "caused by or resulting from" faulty workmanship.

---

[9] In discussing the application of the ensuing loss clause, the circuit court referred to the "tank car rupture/chlorine release" as a single peril. However, as noted above, we are presuming for purposes of applying the ensuing loss clause that the Insurers are correct that the Maintenance Vendors' negligent repairs proximately caused the damage to the tank car, including its ultimate rupture. Therefore, for the purposes of our analysis, the tank car rupture and the subsequent chlorine spill are two distinct events.

20

While the Insurers cite various cases from other jurisdictions in support of this narrower view of the ensuing loss clause, they rely heavily on *TMW Enterprises, Inc. v. Federal Insurance Company*, 619 F.3d 574 (6th Cir. 2010). In that case, the Sixth Circuit considered the effect of an ensuing loss clause in a faulty workmanship exclusion where defective construction of the exterior of a building allowed water infiltration that damaged the structure and interior. *See TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 575-77 (6th Cir. 2010). The *TMW* insured claimed coverage for the water damage as an ensuing loss from the faulty workmanship, while the insurer argued that the water damage was a natural and foreseeable result of the faulty workmanship. *Id.* The Sixth Circuit found that the exclusion applied, reasoning that "because defective wall construction naturally and foreseeably leads to water infiltration, the language of the exclusion, not the exception to the exclusion, ought to apply." *Id.* at 579.

Based upon our review of the record and applicable law, we disagree with the Insurers and find that the circuit court correctly applied the ensuing loss provision. As stated above, under Georgia law we must refer to the plain language of the policy. *See Reed*, 667 S.E.2d at 92. The language at issue here, "[t]his exclusion does not apply to resultant physical loss or damage not otherwise excluded," does not plainly mean what Insurers suggest. Nothing in this clause requires the resultant damage to be unforeseeable or that the resultant damage not be directly caused by the damage caused by faulty workmanship.

21

Moreover, while Georgia caselaw provides little guidance in interpreting ensuing loss provisions, caselaw from federal courts applying Georgia law counsels against the interpretation reached in *TMW* and advocated for by the Insurers. In *Rountree v. Encompass Home & Auto Ins. Co.*, 501 F. Supp. 3d 1351 (S.D. Ga. 2020), a defectively constructed roof led to leaks in the building, and the insurer claimed that the damaged roof and the subsequent water damage were excluded under a faulty workmanship exclusion, except to the extent the ensuing loss provision[10] applied. *See Rountree*, 501 F. Supp. 3d at 1357. While the court granted summary judgment on the exclusion with respect to all damage to the defectively constructed roof, it found that the water damage inside the building would be a covered ensuing loss unless another exclusion applied. *Id.* at 1358-60. Other federal courts applying Georgia law have reached similar conclusions. *See Sky Harbor Atlanta Ne., LLC v. Affiliated FM Ins. Co.*, No. 21-11329, 2024 WL 4370727, at *11 (11th Cir. Oct. 2, 2024) (finding that ensuing loss provision meant "the resulting physical damage (or consequences or effects) of a construction defect are covered, even if the Policy will not cover the cost of repairing the defect itself"); *NUCO Invs., Inc. v. Hartford Fire Ins. Co.*, No. 1:02 CV 1622 CAP, 2005 WL 3307089, at *5 (N.D. Ga. Dec. 5, 2005) (finding that, even if excluded defective design or faulty workmanship in ventilation system led to the growth of mold, the mold damage was a covered ensuing loss).

---

[10] The ensuing loss clause to the faulty workmanship exclusion in that case provided "However, any ensuing loss not excluded or excepted in this policy is covered."

22

Therefore, we conclude that the circuit court correctly found that the damage to the Natrium Plant caused by the chlorine spill was an ensuing loss stemming from the Maintenance Vendors' faulty workmanship on the tank car. Accordingly, we find that the circuit court did not err in granting Westlake's motion for summary judgment on the faulty workmanship exclusion and in denying the Insurers' competing summary judgment motion.

Moreover, we find no reversible error in the circuit court's decision to strike the Insurers' seventeenth affirmative defense to the extent it invoked the faulty workmanship exclusion. The Insurers argue that, even to the extent the exclusion does not apply to Westlake's claim for damage to the plant, they should be permitted to argue to a jury that the Maintenance Vendors' faulty workmanship caused the damage to the tank car. However, as Westlake has repeatedly renounced any claim for damage to the ruptured tank car, we find that this issue is moot. Accordingly, we affirm the circuit court's November 19, 2021, order on the faulty workmanship exclusion.

### 2. The Pollution Exclusions

Next, the Insurers argue that the circuit court erred in finding that the pollution exclusions did not apply. As set forth above, the Insurers raised two pollution exclusions: one that is in each of the Policies, and another only in the policy issued by National Union. We will address each in turn.

23

The pollution exclusion in all the Policies provides that "this Policy does not insure against loss, damage, costs or expenses in connection with any kind or description of seepage and/or pollution and/or contamination, direct or indirect, arising from any cause whatsoever." As noted above, the circuit court found this exclusion inapplicable, reasoning that it only excluded damage caused by environmental pollution or contamination. The Insurers argue that the circuit court's conclusion is contrary to the unambiguous language of the policy and Georgia caselaw interpreting similar policies. We agree.

As the circuit court recognized, the Policies do not directly define the terms "pollution," "contamination," or "seepage." Under Georgia law, "when a term or phrase used in an insurance policy is undefined, courts look to the commonly accepted meaning of the term." *Alea London Ltd. v. Lee*, 649 S.E.2d 542, 544 (Ga. Ct. App. 2007). Georgia courts look to dictionaries for the commonly accepted meaning of a term. *See id.*; *Mason v. Permanent Gen. Assurance Corp.*, 896 S.E.2d 878, 882 (Ga. Ct. App. 2024) (citing the Merriam-Webster Online Dictionary), *cert. denied* (June 11, 2024). Contrary to this approach, the circuit court looked at the separate "Authorities Exclusion," in which "seepage or pollution or contamination" are characterized as forms of "environmental impairment," and reasoned that even when used in another exclusion, these terms referred to "impairment of land, air or bodies of water, and not operating equipment or other property at the Natrium Plant."[11] We disagree with the circuit court's interpretation.

---

[11] In addition to departing from the Georgia practice of looking to the common meaning of undefined terms, this violates the principle "that exclusions in insurance

24

Instead, we find that the Authorities Exclusion's reference to seepage, pollution, or contamination specifically in the context of environmental impairment does not require that these terms should be understood to refer only to environmental impairment. Indeed, the limited language in the Authorities Exclusion directly contrasts with the pollution exclusion, which refers to "*any kind or description* of seepage and/or pollution and/or contamination, direct or indirect, *arising from any cause whatsoever*." (emphasis added).

In reviewing the dictionary definitions of the terms "pollution," "contamination," or "seepage," we find that these terms are not limited to the context of situations involving environmental impairment. Of the three terms, "pollution" most closely suggests a specific connection to environmental impairment. Merriam-Webster primarily defines pollution as "the action of polluting . . . *especially*: the action of making an environment unsuitable or unsafe for use by introducing chemical or manufacturing waste." *See Pollution*, Merriam-Webster, https://www.merriam-webster.com/dictionary/pollution (last visited November 5, 2025). However, the definition of "contamination" does not suggest that it exclusively concerns environmental impairment. Merriam-Webster primarily defines "contamination" as "a process of contaminating : a state of being contaminated" and defines "contaminate" as "to soil, stain, corrupt, or infect by contact or association" or "to make inferior or impure by

policies are to be read independently of one another." *Nationwide Prop. & Cas. Ins. Co. v. Hampton Ct., L.P.*, 754 F. Supp. 3d 1349, 1358 (N.D. Ga. 2024) (citing *Fid. Nat. Title Ins. Co. of New York v. OHIC Ins. Co.*, 619 S.E.2d 704, 707 (Ga. Ct. App. 2005)).

25

admixture." *Contamination*, Merriam-Webster, https://www.merriam-webster.com/dictionary/contamination (last visited November 5, 2025); *Contaminate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/contaminate (last visited November 5, 2025). "Seepage" is defined as "the process of seeping : oozing" or "a quantity of fluid that has seeped (as through porous material)." *Seepage*, Merriam-Webster, https://www.merriam-webster.com/dictionary/seepage (last visited November 5, 2025). "Seep" is most relevantly defined to mean "to flow or pass slowly through fine pores or small openings : ooze." *Seep*, Merriam-Webster, https://www.merriam-webster.com/dictionary/seep (last visited November 5, 2025).

Moreover, the Supreme Court of Georgia has soundly rejected the view that pollution exclusions should be read to apply only to environmental impairment. *See Georgia Farm Bureau Mut. Ins. Co. v. Smith*, 784 S.E.2d 422, 425 (Ga. 2016) ("Georgia courts have repeatedly applied these clauses outside the context of traditional environmental pollution."); *see also Love Lang v. FCCI Ins. Co.*, 530 F. Supp. 3d 1299, 1308 (N.D. Ga. 2021) (collecting cases from Georgia courts and federal courts applying Georgia law). Westlake contends that these Georgia cases are inapposite because they primarily addressed commercial general liability policies, rather than the all-risk property insurance at issue here. However, beyond this assertion, Westlake fails to identify any reason this Court should break with the Georgia courts simply because the type of policy at issue is different. While it is true that most of the pollution exclusions addressed in the

26

relevant Georgia cases were worded differently than the pollution exclusion in this case,[12] Westlake fails to explain how these differences compel a contrary interpretation under Georgia law.

Reviewing the plain language of the pollution exclusion, the definitions of the relevant terms, and Georgia precedent, we find no basis to limit the pollution exclusion to environmental impairment, as the circuit court did. Rather, we find that the exclusion itself is unambiguous and that the references to contamination and seepage within the exclusion broadens its application to more than just environmental impairment. Having concluded that the unambiguous pollution exclusion is not limited to environmental impairment, we find that it applies in this case. Beyond arguing that the exclusion should be limited to environmental impairment, Westlake does not meaningfully dispute the Insurers' argument that chlorine is a contaminant, and that contamination caused the damage to the equipment at the Natrium Plant. However, though the pollution exclusion

_____

[12] In *Smith*, for instance, the pollution exclusion provided:

> This insurance does not apply to:
> ...
> (f) Pollution
> (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants": (a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.

*Smith*, 784 S.E.2d at 423. The policy defined "pollutant" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id.*

27

applies to the chlorine spill and the damage it caused, that is not the end of our analysis. Although the circuit court determined that the pollution exclusion did not apply, it also found that, even if the exclusion applied, an exception to the exclusion would preserve coverage.

Specifically, the circuit court applied an exception to the pollution exclusion that provided that damage from pollution, contamination, or seepage would be covered if it resulted from an insured loss:

> However, if the insured property is the subject of direct physical loss or damage for which this company has paid or agreed to pay then this Policy (subject to its terms, conditions and limitations) insures against direct physical loss or damage to the property insured hereunder caused by resulting seepage and/or pollution and/or contamination.

The Insurers provide little analysis of this exception, except to argue that the circuit court did not find that Westlake carried its burden of proving that the exception applied and that the Insurers never "paid or agreed to pay" for any of Westlake's losses because they are excluded. As an initial matter, by finding that the exception applied, the circuit court determined that Westlake carried its burden, even if the court did not explicitly state as much. Moreover, the Insurers' bald assertion that the exception does not apply because the claimed exclusions apply is unhelpful; as reflected above, the faulty workmanship exclusion does not apply as broadly as the Insurers contend. Reviewing the language of this exception de novo, we find that it is ambiguous, because we can reasonably read it in different ways.

28

One reasonable reading of this exception under the facts of this case is that it would not apply if the reader presumes, as this Court does for purposes of this decision, that the Maintenance Vendors' faulty workmanship caused the tank car rupture. As analyzed above, the ensuing loss clause of the faulty workmanship exclusion[13] requires the Court to look at the chlorine spill independently and determine whether it is a covered peril. Since we have found that the chlorine spill caused damage through contamination, an excluded peril, the damage it caused is not covered. Moreover, since that excluded peril of contamination itself resulted from damage caused by the excluded peril of faulty workmanship, it did not result from a "direct physical loss or damage for which this company has paid or agreed to pay," and the exception to the pollution exclusion does not apply. In other words, the ensuing loss clause of the faulty workmanship exclusion does not preserve coverage because the ensuing loss was itself excluded contamination, and the exception to the pollution exclusion does not preserve coverage because the direct physical loss that caused the chlorine spill, the tank car rupture, resulted from the excluded peril of faulty workmanship.

However, we find that this obscurely worded exception can also be reasonably read to provide coverage under the facts of this case. Under this reading, the

---

[13] As we noted above, generally under Georgia law we must consider the exclusions independently of one another. However, because the exception to the pollution exclusion specifically requires the Court to consider whether an excluded peril itself resulted from a covered loss, we must necessarily interpret that exception in the context of other implicated exclusions.

29

chlorine spill caused the excluded contamination. Since the chlorine spill falls under the ensuing loss clause of the faulty workmanship exclusion, it is a covered peril, and as the circuit court concluded, the chlorine itself was "insured property" that was "the subject of direct physical loss." Because the contamination to the Natrium Plant resulted from this covered loss, the exception to the pollution exclusion is triggered and the Policies provide coverage for the damage to the plant that would otherwise fall within the pollution exclusion. Since the exception to the pollution exclusion is ambiguous and this second reading is more favorable to the insured, we must accept it. *See Hurst*, 470 S.E.2d at 663 (citing Ga. Code § 13-2-2(5)) ("[T]he statutory rules of construction require that we construe the ambiguous clause against the insurer."). Accordingly, we find that, although the general pollution exclusion applies, the exception to the exclusion preserves coverage. Therefore, we conclude that the circuit court did not commit reversible error in finding that the general pollution exclusion did not apply.

Next, we consider the pollution exclusion specific to the National Union Policy:

> This policy does not cover loss or damage caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of CONTAMINANTS or POLLUTANTS, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any physical damage insured by this policy.

This exclusion defined contaminants or pollutants in part as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis,

30

chemicals and waste, which after its release . . . threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder." Like the general pollution exclusion, the circuit court found that this exclusion only applies to environmental impairment.

As with the general pollution exclusion, the Insurers argue that the circuit court erred by limiting the National Union pollution exclusion only to environmental impairment. We agree. We find that the language of this exclusion is plain and unambiguous, and that the chlorine that caused damage to the Natrium Plant in this case clearly fits the exclusion's definition of a contaminant or pollutant. Moreover, the language of the National Union exclusion is far more similar to the exclusions addressed in *Smith* and other Georgia cases than the general pollution exclusion. *See Smith*, 784 S.E.2d at 423; *Reed v. Auto-Owners Ins. Co.*, 667 S.E.2d 90, 92 (Ga. 2008). Therefore, the reasoning of those cases, rejecting the principle that pollution exclusions should be limited to environmental impairment, applies with greater force to the National Union pollution exclusion. Accordingly, we find that the National Union pollution exclusion applies and bars Westlake's claim.[14]

---

[14] Westlake briefly asserts that the exception to the general pollution exclusion precludes application of the National Union pollution exclusion. We disagree. As noted above, we must read exclusions independently of one another. *See Hampton Ct., L.P.*, 754 F. Supp. 3d at 1358. "If any one exclusion applies there should be no coverage, regardless of inferences that might be argued on the basis of exceptions or qualifications contained in other exclusions." *Fid. Nat. Title Ins. Co. of New York v. OHIC Ins. Co.*, 619 S.E.2d 704, 707 (Ga. Ct. App. 2005) (quoting *Weedo v. Stone-E-Brick, Inc.*, 405 A.2d 788, 795 (N.J.

31

Having concluded that the National Union pollution exclusion applies, we find that, as to National Union, the circuit court erred in denying the Insurers' motion for summary judgment on the pollution exclusions and in granting Westlake's competing motion. Accordingly, we reverse the circuit court's November 19, 2021, order on the pollution exclusion as to National Union. However, because the exception to the general pollution exclusion preserves coverage, we find that, as to all the Insurers other than National Union, the circuit court did not err in granting Westlake's motion for summary judgment on the pollution exclusions and in denying the Insurers' competing motion. Therefore, as to all the Insurers other than National Union, we affirm the November 19, 2021, order on the pollution exclusions.

### 3. The Corrosion Exclusion

The Insurers also argue that the circuit court erred in finding that the corrosion exclusion did not bar Westlake's claim. As related above, this exclusion provides that the Policies do "not insure against loss, damage or expense caused by or resulting from . . . wear and tear, rust, corrosion, erosion, depletion or gradual deterioration, but not excluding resultant physical loss or damage from a covered peril." The circuit court reasoned that, although it was undisputed that Westlake's claimed damage to the equipment at the Natrium Plant was corrosion, corrosion was the type of damage suffered, rather than

---

1979)). Georgia courts have rejected the argument that an exception to one exclusion preserves coverage in the face of another applicable exclusion. *See Al Who Enters., Inc. v. Capitol Indem. Corp.*, 457 S.E.2d 696, 698 (Ga. Ct. App. 1995); *Gary L. Shaw Builders, Inc. v. State Auto. Mut. Ins. Co.*, 355 S.E.2d 130, 133 (Ga. Ct. App. 1987).

32

the cause of the damage. The circuit court concluded that the exclusion only applies to damage or expense caused by or resulting from corrosion, not corrosion damage caused by a covered peril.

The Insurers challenge the circuit court's differentiation between corrosion as a cause of loss and a type of damage, relying heavily on cases from other jurisdictions in which courts refused to recognize this distinction. In *Bettigole v. American Employers Insurance Company*, the Appeals Court of Massachusetts rejected an insured's argument that corrosion damage to the concrete and steel of a parking deck should not be excluded under a corrosion exclusion. *Bettigole v. Am. Emps. Ins. Co.*, 567 N.E.2d 1259, 1261-62 (Mass. App. Ct. 1991). While the insured argued that the real cause of loss was chloride ions released over time by de-icing chemicals used on the concrete, the court found that if that "view were adopted, the corrosion exclusion would tend to disappear altogether because some similar agent of the process could always be identified." *Id.* at 1262. The Supreme Court of Virginia reached a similar conclusion in *TravCo Insurance Company v. Ward*, in which the insured argued his claim for corrosion damage to metal items in his home was not barred by a corrosion exclusion because sulfur gas emitted from drywall caused the corrosion. *See TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 327-28 (Va. 2012). The *TravCo* court rejected the argument that the damage was the corrosion, rather than being caused by corrosion, reasoning that "[s]uch a construction would render this and similar corrosion exclusions meaningless." *Id.* at 328b   m.

33

Although federal courts applying Georgia law have not used the "cause of loss" and "type of damage" terminology the parties use in this matter, they have recognized a principle similar to the distinction the circuit court relied on. Specifically, one district court determined that "Georgia has adopted the efficient proximate cause doctrine." *Burgess v. Allstate Ins. Co.*, 334 F. Supp. 2d 1351, 1361 (N.D. Ga. 2003). The court explained that "[t]he efficient proximate cause doctrine applies when two or more identifiable causes contribute to a single property loss-at least one of them covered under the policy and at least one of them excluded under the policy." *Id.* at 1360 (citing *Kelly v. Farmers Ins. Co.*, 281 F.Supp.2d 1290, 1295–96 (W.D. Okla. Sept.12, 2003)). Under this doctrine, "[w]hen an insured can identify an insured peril as the proximate cause, then there is coverage even if subsequent events are specifically excluded from coverage." *Id.* (citing *Bowers v. Farmers Ins. Exch.*, 991 P.2d 734, 738 (Wash. App. 2000)).

In *Burgess*, the insured claimed coverage for water damage to her home, while the insurer argued that much of the damage was mold, which was specifically excluded under the policy. *See id.* at 1356-57. The court ruled that there was an issue of fact for the jury of whether the efficient proximate cause of the damage was the covered peril, water damage, or the excluded peril, mold. *Id.* at 1364. In *ACE American Insurance Company v. Exide Technologies, Inc.*, No. 1:16-CV-1600-MHC, 2017 WL 11629194, (N.D. Ga. Sept. 20, 2017), *rev'd and remanded on other grounds sub nom. Ace Am. Ins. Co. v. Wattles Co.*, 930 F.3d 1240 (11th Cir. 2019), the court applied the efficient proximate cause doctrine in the context of a corrosion exclusion. While the insurer argued that the damage

34

at issue was corrosion, the court found that the release of sulfuric acid mist, a covered peril, was the efficient proximate cause of the damage, and the corrosion exclusion did not apply. *See ACE Am. Ins. Co.*, at *8-9.

We find that, under the efficient proximate cause doctrine, Westlake's claim for damage caused by the covered peril of the chlorine spill is not excluded under the corrosion exclusion.[15] As *Bettigole* and *TravCo* illustrate, there may be factual situations in which the process that caused corrosion is indistinguishable from the corrosion itself as a cause of loss. However, after *Bettigole*, the Supreme Judicial Court of Massachusetts applied the efficient proximate cause doctrine and reiterated the principle that "where the excluded event is not the cause of the loss, but rather the *result* of a covered risk, the insured may recover." *Jussim v. Massachusetts Bay Ins. Co.*, 610 N.E.2d 954, 957 (Mass. 1993). The court distinguished *Bettigole* from this general principle because in that case "there was no covered risk distinct from, and preceding, the corrosion." *Id.* at 956 n.3. Here, the chlorine spill is a clearly distinct peril from any corrosion damage on the Natrium Plant equipment that the spill caused.

---

[15] The circuit court also found that the ensuing loss clause of the corrosion exclusion preserved coverage. Moreover, while the circuit court declined to decide this issue below, Westlake argues that the corrosion exclusion only applies to gradually occurring corrosion. Because we find that, under the efficient proximate cause doctrine, the corrosion exclusion does not apply to any corrosion caused by the chlorine spill, we find it unnecessary to address these issues.

35

However, we find that there is an issue of material fact with respect to the efficient proximate cause of the corrosion damage. In addition to arguing that all corrosion damage is excluded, the Insurers also contend that the corrosion damage at the Natrium Plant preexisted the August 27, 2016, chlorine spill. Accordingly, they argue that the circuit court erred by completely striking the seventeenth affirmative defense to the extent it raised the corrosion exclusion. In its response, Westlake concedes that the circuit court erred by completely striking the corrosion exclusion as an affirmative defense. Moreover, Westlake does not dispute that any preexisting corrosion would be excluded under the corrosion exclusion. At oral argument, Westlake's counsel recognized that a jury should determine how much of the corrosion to the Natrium Plant equipment was caused by the spill and how much preexisted the spill.

Accordingly, we affirm the circuit court's ruling that the corrosion exclusion does not apply to Westlake's claim to the extent the chlorine spill caused corrosion damage and its denial of the Insurers' motion for summary judgment on the corrosion exclusion. However, we find that the circuit court erred in granting Westlake's motion for summary judgment on the corrosion exclusion and in striking the Insurers' seventeenth affirmative defense based on the corrosion exclusion, because there is an issue of material fact regarding the efficient proximate cause of the corrosion damage. Therefore, the circuit court's November 19, 2021, order on the corrosion exclusion is affirmed in part and reversed in part, and we remand this matter for a jury to determine the efficient proximate cause of the corrosion damage.

36

**B. Breach of Contract and Declaratory Judgment**

In their fifth assignment of error, the Insurers challenge the circuit court's December 10, 2024, order granting Westlake's motion for summary judgment on its breach of contract and declaratory judgment claims. First, the Insurers argue that the circuit court erred in granting summary judgment to Westlake on these claims because, as argued in their first four assignments of error, there is no coverage for Westlake's claim under the Policies because it is excluded under the faulty workmanship, pollution, and corrosion exclusions.

As an initial matter, based on our ruling that there is an issue of fact on the efficient proximate cause of the corrosion damage at the Natrium Plant, we must necessarily reverse this order to the extent it granted summary judgment to Westlake for all corrosion damage. Moreover, because there is an issue of material fact for a jury as to the quantum of the claimed damage at the Natrium Plant attributable to the chlorine spill, we vacate the December 10, 2024, order to the extent it entered judgment in Westlake's favor and awarded breach of contract damages.

However, to the extent the circuit court granted summary judgment on the issue of the Insurers' liability to Westlake on the declaratory judgment and breach of contract claims for damage to the Natrium Plant caused by the chlorine spill, pursuant to our prior analysis, we find that the Insurers' argument that the exclusions apply is unsuccessful as to all Insurers other than National Union. As addressed above, the

37

exclusions present in all the Policies do not bar Westlake's claim for any damage caused by the chlorine spill. However, the National Union pollution exclusion excludes Westlake's claim against National Union, and the circuit court erred in not granting the Insurers' motion for summary judgment to National Union. Since Westlake's claim is excluded under National Union's policy, we find that the circuit court erred in granting Westlake summary judgment on its breach of contract and declaratory judgment claims against National Union.

Next, the Insurers argue that the circuit court erred in granting summary judgment on these claims because Westlake breached the "Proof of Loss" clause in the Policies. This clause provides that "[u]pon [the Insurers'] request [Westlake] shall exhibit the damaged property to [the Insurers], . . . and produce for [the Insurers'] examination all pertinent records and sales invoices." The Insurers point to their January 26, 2018, request to Westlake for any pre-incident photographs of the Natrium Plant as well as the results of any post-incident analysis of damaged property. They argue that this request necessarily encompassed the report of Westlake's engineering consultant, Exponent, Inc., which Westlake failed to disclose to the Insurers until the circuit court compelled its production during this litigation. The Insurers contend that this was a breach of a condition precedent, precluding coverage under the Policies. In rejecting this argument below, the circuit court found that it was both untimely and meritless.

Clauses like the "Proof of Loss" clause in the Policies are sometimes characterized as "cooperation clauses," which Georgia courts treat as conditions precedent to recovery. *See Hill v. Safeco Ins. Co. of Am.*, 93 F. Supp. 2d 1375, 1379 (M.D. Ga. 1999) (citing *Townley v. Patterson*, 228 S.E.2d 164, 165 (Ga. Ct. App. 1976)). "Under Georgia law, an insured's failure to cooperate with the insurer in the investigation of a claim, without a valid excuse, may constitute a breach of the insurance contract, precluding any recovery by the insured." *Roberts v. State Farm Fire & Cas. Co.*, 479 F. App'x 223, 226 (11th Cir. 2012) (citing *Halcome v. Cincinnati Ins. Co.*, 334 S.E.2d 155, 156–57 (Ga. 1985)). However, the non-disclosed information must be "material" to constitute a breach. *See Halcome v. Cincinnati Ins. Co.*, 334 S.E.2d 155, 157 (Ga. 1985); *H.Y. Akers & Sons, Inc. v. St. Louis Fire & Marine Ins. Co.*, 172 S.E.2d 355, 358 (Ga. Ct. App. 1969) (recognizing in the context of a liability policy that "[noncooperation] must, of course, have been material-not merely technical or inconsequential in nature").

In its response, Westlake argues that its delay in producing the requested documents did not prejudice the Insurers. Westlake notes that it provided the requested pre-incident photographs of the Natrium Plant to the Insurers five months before they denied coverage, and the Insurers have not identified anything in the Exponent report that was required for their coverage determination. In effect, Westlake argues that any breach of the Proof of Loss clause was inconsequential. In their reply, the Insurers do not challenge this assertion or point to any evidence in the record demonstrating that Westlake's delay in the production of the pre-incident photographs or its failure to disclose Exponent's report

39

impacted their coverage determination. Indeed, the Insurers do not address Westlake's substantive argument on this point at all, focusing instead on the issue of whether this defense was timely raised. Considering the Insurers' failure to dispute Westlake's contention that any breach of the Proof of Loss clause was inconsequential, we find that the Insurers have not demonstrated that the circuit court erred in granting Westlake's motion for summary judgment on its breach of contract and declaratory judgment claims.[16]

Finally, the Insurers also argue that the circuit court abused its discretion by awarding prejudgment interest. However, we find that this argument is moot. Because we are vacating the circuit court's entry of judgment and damages award, we must necessarily vacate the circuit court's decision to grant prejudgment interest on that award.

Accordingly, we reverse the circuit court's December 10, 2024, summary judgment order to the extent it granted Westlake summary judgment on its declaratory judgment and breach of contract claims for any corrosion damage at the plant that preexisted the chlorine spill. We also reverse that order to the extent it granted summary judgment to Westlake against National Union. Additionally, we vacate the order to the extent it entered a judgment for damages and prejudgment interest. Finally, we affirm the order to the extent it granted summary judgment to Westlake on its declaratory judgment

---

[16] Because the Insurers have not demonstrated that the circuit court erred in rejecting the "cooperation clause" argument on the merits, we decline to address the circuit court's conclusion that the Insurers waived this argument by failing to timely raise it.

40

and breach of contract claims against all the Insurers other than National Union, but only on the issue of liability for any damage caused by the chlorine spill.

## C. Set-off

In their sixth assignment of error, the Insurers challenge the circuit court's December 10, 2024, order denying the Insurers' motion for set-off. In that order, the circuit court determined that the Insurers were not entitled to set off the judgment in the Pennsylvania Action against the judgment in this matter. The circuit court relied on Georgia Code § 13-7-4 (1933), which provides that "[s]etoff must be between the same parties and in their own right," and found that it could not set off two judgments in favor of Westlake against one another. The circuit court also found that the Insurers must rely on the subrogation provisions in the Policies for any set-off.

The Insurers argue that Georgia Code § 13-7-4 is inapplicable because it deals with the set-off of mutual debts between parties to an action. The Insurers assert that they were not seeking a set-off of debts, but of one judgment (the Pennsylvania judgment) against another (the judgment entered below). We find that this argument is moot given our prior ruling vacating Westlake's damages award. As the circuit court's December 10, 2024, order has been vacated as to damages, there is not, at this time, a West Virginia circuit court judgment on which to apply a set-off.

The Insurers also take issue with the circuit court's conclusion that, in the absence of statutory authority permitting a set-off, the Insurers must rely on the subrogation provisions in the Policies. Pointing out that Westlake has already litigated its claims against the Maintenance Vendors in Pennsylvania, the Insurers claim that subrogation is inapplicable. To the extent the Insurers sought set-off as a contractual right, we agree with the circuit court that it was Insurers' burden to identify and invoke a provision in the contract that provides such a right. In denying an insurer's request for a set-off for prior payments by a third party, the Supreme Court of Georgia explained that "[e]ven though there is no public policy interest in encouraging double recovery, the primary responsibility for writing coverage that limits the insurer's obligation to actual losses lies with the insurer in the drafting of its contract." *Anderson v. Mullinax*, 497 S.E.2d 796, 797 (Ga. 1998) (citation modified). However, as the Insurers have not invoked the subrogation provisions of the Policies in this matter, we take no position on whether the procedural posture of the Pennsylvania Action precludes the Insurers from recouping the judgment from that matter under the subrogation provisions.[17]

---

[17] On October 3, 2025, the Insurers filed a motion to supplement the appendix, requesting the court to take judicial notice of pleadings filed in the Pennsylvania Action demonstrating that the Maintenance Vendors have satisfied the judgment in that action. In their motion, the Insurers argue that this satisfaction supports their argument that subrogation efforts under the Policies' provisions are no longer feasible. However, since we decline to speculate on the potential success of any effort to recoup the amount of the Pennsylvania judgment under the subrogation provisions, we find that these documents are irrelevant. Accordingly, we refuse the Insurers' October 3, 2025, motion as moot.

Accordingly, we affirm the circuit court's December 10, 2024, order denying the Insurers' motion for set-off to the extent the circuit court refused set-off as a contract right. We vacate this order to the extent the circuit court denied the set-off of judgments in light of the Court's ruling vacating the circuit court's damages award.

## D. Collateral Estoppel

In its first assignment of error, Westlake challenges the circuit court's March 3, 2022, order granting summary judgment on collateral estoppel and the January 24, 2023, order denying Westlake's motion to alter or amend that order. Westlake contends that the circuit court erred in concluding that the Pennsylvania jury's finding of $5,900,000 of damage to the Natrium Plant established Westlake's breach of contract damages in this case as a matter of law. As recognized by the circuit court, under Pennsylvania law,[18] a party asserting collateral estoppel must establish the following elements:

> (1) the issue decided in the prior case is identical to one presented in the later case; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding and (5) the determination in the prior proceeding was essential to the judgment.

---

[18] No party disputes the circuit court's conclusion that Pennsylvania law controls the issue of collateral estoppel. *See Jordache Enters., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 204 W. Va. 465, 476, 513 S.E.2d 692, 703 (1998).

43

*Century Indem. Co. v. OneBeacon Ins. Co.*, 173 A.3d 784, 805 (Pa. Super. Ct. 2017) (quoting *Heldring v. Lundy Beldecos & Milby, P.C.*, 151 A.3d 634, 644 (Pa. Super. Ct. 2016)).

Westlake challenges the first element, arguing that the issue in this case is different from the issue in the Pennsylvania Action, because the theories of liability are different. According to Westlake, the Pennsylvania court never instructed the jury to determine the total amount of damage the chlorine spill caused to the Natrium Plant, which is the factual issue in this case. Rather, Westlake maintains that the jury only determined the damage caused by the Maintenance Vendors' liability in that action. Westlake also contends that the issue in this case is distinct because the amount of damage must be calculated differently under the Policies than it was in the Pennsylvania Action.

As an initial matter, we reject Westlake's attempt to broadly distinguish the factual issues in the two cases. Westlake makes much of the difference between the "damage" to the Natrium Plant and the "damages" for the Maintenance Vendors' liability that the Pennsylvania jury calculated. However, as part of its decision, the jury also calculated the specific amount of damage to the Natrium Plant, assigning the specific value of $5,900,000 for that damage. Therefore, although "damages" and "damage" are distinct concepts, in the Pennsylvania Action the damage to the Natrium Plant—the factual question at issue in this case—was a subcategory of the overall "damages" the court instructed the jury to determine. While Westlake suggests that the Pennsylvania jury's

44

finding is distinguishable because it was instructed to consider Westlake's contributory negligence, we disagree. We find no merit in Westlake's argument in this regard as the jury verdict form in that case directed the jury to calculate the damages caused by the Maintenance Vendors' conduct, including the damage to the plant, "without any reduction for the percentage of negligence (if any) you attributed to [Westlake]." Therefore, while the Pennsylvania jury found Westlake 40% negligent, that contributory negligence did not impact the finding of $5,900,000 in damage to the plant.

However, while we agree with the circuit court and the Insurers that the Pennsylvania jury decided the same general factual issue present in this case (the amount of damage to the Natrium Plant), we also agree with Westlake that the issues are not completely identical, because the calculation of that damage is different in this matter. In the Pennsylvania Action, when the court tasked the jury to determine the amount of damage to the plant, it instructed:

> If the property was not a total loss, but some harm is partially repairable and some harm is permanent, damages may include the reasonable cost of repairs in addition to the reduction in market value of the property. However, where goods or personalty are of such character that their market value cannot compensate for their loss, replacement cost is the appropriate measure of damages.

In contrast, under the "Basis of Recovery" clause in the Policies, Westlake is entitled to recover for damage to "[m]achinery and equipment at functional replacement cost, defined as the cost of equipment used to replace equipment insured which has been lost or damaged by an insured peril." Put simply, although a jury in this case will be tasked with deciding

45

the same general factual issue the Pennsylvania jury considered—the amount of damage to the Natrium Plant—this jury's method of calculating the value of that damage may be different. Most critically, the dollar value of "functional replacement cost" for damaged plant machinery and equipment under the Policies may exceed "the reasonable cost of repairs in addition to the reduction in market value of the property" awarded for the same exact damage by the Pennsylvania jury.

Accordingly, we find that the issue in the underlying action is not identical to the issue previously decided in the Pennsylvania Action,[19] and, thus, the circuit court erred in granting the Insurers' motion for partial summary judgment on the issue of collateral estoppel. Therefore, we reverse the circuit court's March 3, 2022, order granting summary judgment on collateral estoppel, and the January 24, 2023, order denying Westlake's motion to alter or amend the March 3, 2022, order,[20] and remand this matter for a jury to determine Westlake's damages on its breach of contract claim.

---

[19] Because this ruling is dispositive of the issue of collateral estoppel, we find it unnecessary to consider Westlake's additional argument that it did not have a full and fair opportunity to litigate the issue in the Pennsylvania Action.

[20] While Westlake challenges the January 24, 2023, order and argues that the denial of its Motion to Alter or Amend was a "separate error," it does not argue this issue separately from its arguments directed at the March 3, 2022, order. However, since we reverse the underlying summary judgment order, we reverse the January 24, 2023, order as well.

46

**E. Bad Faith**

In its second assignment of error, Westlake challenges the circuit court's

May 8, 2024, order granting the Insurers' motion for summary judgment on Westlake's

bad faith claim. Westlake claims that there is an issue of material fact regarding whether

the Insurers' denial of Westlake's claim was motivated by bad faith.

Under Georgia law, Georgia Code § 33-4-6 (2016)[21] "provides the exclusive

remedy for an insured's claim of bad faith failure to pay policy proceeds." *Am. Safety*

*Indem. Co. v. Sto Corp.*, 802 S.E.2d 448, 456 (Ga. Ct. App. 2017). To prevail on a claim

under this statute, "the insured must prove: (1) that the claim is covered under the policy,

(2) that a demand for payment was made against the insurer within 60 days prior to filing

suit, and (3) that the insurer's failure to pay was motivated by bad faith." *BayRock Mortg.*

*Corp. v. Chicago Title Ins. Co.*, 648 S.E.2d 433, 435 (Ga. Ct. App. 2007). The Court of

Appeals of Georgia has explained that "[o]rdinarily, the question of bad faith is one for the

---

[21] This section provides, in relevant part:

> In the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same within 60 days after a demand has been made by the holder of the policy and a finding has been made that such refusal was in bad faith, the insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer.

Ga. Code § 33-4-6(a) (2016).

jury. However, when there is no evidence of unfounded reason for the nonpayment, *or* if the issue of liability is close, the court should disallow imposition of bad faith penalties." *Montgomery v. Travelers Home & Marine Ins. Co.*, 859 S.E.2d 130, 135 (Ga. Ct. App. 2021) (quoting *Lee v. Mercury Ins. Co. of Georgia*, 808 S.E.2d 116, 133 (Ga. Ct. App. 2017)). Critically, "[t]his rule applies even if genuine issues of fact exist with regard to whether the insurer's conduct in denying the claim, in part, may have been based on bad faith." *Id.* "An insurer thus having any reasonable factual or legal ground for contesting a claim is entitled to summary judgment under [Georgia Code] § 33–4–6." *Amica Mut. Ins. Co. v. Sanders*, 779 S.E.2d 459, 463 (Ga. Ct. App. 2015).

We do not find that the circuit court erred when it found that the Insurers' exclusion defenses were reasonable grounds to contest Westlake's claim. Moreover, Westlake's recognition that there is an issue of fact for a jury regarding how much of the corrosion at the plant was actually caused by the chlorine spill is fatal to its bad faith claim. As the Court of Appeals of Georgia has explained, "the very fact that certain factual issues regarding the merits of a claim are in genuine conflict . . . causes there to be no conflict, as a matter of law, whether an insurance company had reasonable grounds to contest a particular claim." *Rice v. State Farm Fire & Cas. Co.*, 430 S.E.2d 75, 78 (Ga. Ct. App. 1993). Westlake argues that there is evidence in the record that the Insurers denied Westlake's claim based not on the advice of their technical consultants, but because the estimates were too high. However, Westlake never directly contests that the issue of liability is close in this case. Because the Insurers had reasonable factual and legal grounds

48

to contest the claim and there are factual issues related to liability, we affirm the circuit court's decision to grant summary judgment on this claim, even if Westlake is correct that "genuine issues of fact exist with regard to whether the insurer's conduct in denying the claim, in part, may have been based on bad faith." *Montgomery*, 859 S.E.2d at 135. Accordingly, we affirm the circuit court's May 8, 2024, order granting the Insurers' motion for summary judgment on Westlake's bad faith claim.

## F. Prejudgment Interest

In its third and final assignment of error, Westlake argues that the circuit court erred in its calculation of prejudgment interest. Specifically, Westlake contends that under Georgia law, a court should calculate prejudgment interest on breach of contract damages from the date of the breach. *See* Ga. Code § 13-6-13. Westlake contends that the Insurers breached when they refused to pay Westlake's valid coverage claim on June 21, 2018, thirty days after Westlake submitted the partial proof of loss. Therefore, Westlake claims that the circuit court erred in calculating prejudgment interest from August 10, 2022, the date of the entry of judgment in the Pennsylvania action. However, as we have already vacated the circuit court's damages award and prejudgment interest award in light of the issues of material fact requiring jury resolution, we find that this argument is moot.

49

## IV. CONCLUSION

Based on the foregoing:

- We affirm the circuit court's November 19, 2021, order granting Westlake's motion for summary judgment on the faulty workmanship exclusion and denying the Insurers' motion for summary judgment on that exclusion.

- We affirm the circuit court's November 19, 2021, order granting Westlake's motion for summary judgment on the pollution exclusions and denying the Insurers' motion for summary judgment on the pollution exclusions as to all Respondents other than National Union. As to National Union, we reverse this order and direct the circuit court to enter an order granting summary judgment to National Union.

- We affirm the circuit court's November 19, 2021, order on the corrosion exclusion to the extent of the circuit court's ruling that the corrosion exclusion does not apply to any corrosion damage caused by the chlorine spill. We also affirm this order to the extent it denied the Insurers' motion for summary judgment on the corrosion exclusion. However, we reverse this order to the extent it granted Westlake's motion for summary judgment on the corrosion exclusion and struck the Insurers' seventeenth affirmative defense to the extent it raised the corrosion exclusion.

- We reverse the circuit court's December 10, 2024, final order to the extent it granted Westlake's motion for summary judgment on its declaratory judgment and breach of contract claims for any corrosion damage at the plant that preexisted the chlorine spill. We also reverse that order to the extent it granted summary judgment to Westlake against National Union. Additionally, we vacate the order to the extent it

50

entered a judgment for damages and prejudgment interest. Finally, we affirm the order to the extent it granted summary judgment to Westlake on its declaratory judgment and breach of contract claims against all the Insurers other than National Union, but only on the issue of liability for any damage caused by the chlorine spill.

- We affirm the circuit court's December 10, 2024, order denying the Insurers' motion for set-off to the extent the circuit court refused set-off as a contract right. We vacate to the extent the circuit court denied the set-off of judgments because the judgment in this matter has been vacated.

- We reverse the circuit court's March 3, 2022, order granting the Insurers' motion for summary judgment on collateral estoppel, and the January 24, 2023, order denying Westlake's motion to alter or amend the March 3, 2022, order.

- We affirm the circuit court's May 8, 2024, order granting the Insurers' motion for summary judgment on Westlake's bad faith claim.

- Finally, we remand this matter for a jury trial on the issues of the efficient proximate cause of the corrosion damage at the Natrium Plant and the calculation of Westlake's breach of contract damages.


Affirmed, in part, Reversed, in part, Vacated, in part, and Remanded.